FRUIN–COLNON INTERNATIONAL, S.A. and Le Boeuf & Dougherty, Inc., corporation, a Joint Venture, Plaintiffs,

v.

CONCRETO, S.A., a corporation, Defendant.

and

United States Fidelity & Guaranty Company, a corporation, Surety-Defendant.

Civ. No. 5163.

United States District Court
D. Canal Zone,
Balboa Division.

May 26, 1964.

Roy Phillipps P., Balboa, Canal Zone, Gilbert A. Cuneo, Sellers, Conner & Cuneo, Washington, D. C., for plaintiffs Fruin-Colnon, et al.

De Castro & Robles, Balboa, Canal Zone, Robert Sheriffs Moss, Washington, D. C., for defendant Concreto, S.A.

L. S. Carrington, Balboa, Canal Zone, Guillermo Jurado, Panama, Republic of Panama, for surety-defendant-U. S. Fidelity & Guaranty Co.

CROWE, District Judge.

The plaintiffs, Fruin-Colnon International, S.A. and Le Boeuf & Dougherty, Inc., doing business as a joint venture, entered into a contract with the Panama Canal Company to construct the substructure of a bridge spanning the Panama Canal and designated in the contract as "Balboa Bridge." This bridge has been named by the Congress of the United States as the *Thatcher Ferry Bridge* and Panama through her National Assembly has named it the Bridge of the Americas.

On August 5, 1959, plaintiffs entered into a subcontract with defendant, Concreto, S.A., wherein the defendant agreed to furnish and deliver 30,000 cubic yards, more or less, of ready-mixed concrete as necessary for the "construction of Balboa Bridge Substructure" to the complete intent and in conformance with the covering requirements of the concrete section of the "Specifications for Construction of Balboa Bridge Substructure, Canal Zone, Serial No. PC–59–66, dated April 15, 1959 and as amended by Addenda Nos. 1 and 2", prepared by the Engineering and Construction Bureau of the Panama Canal Company.

The complaint alleges that the defendant failed to comply with the terms of

the contract and United States Fidelity & Guaranty Company was joined as a party defendant as it is the surety on the Performance Bond executed by defendant in favor of plaintiffs.

The plaintiffs set out in their pleadings six causes of action claiming a total sum by reason of Concreto's breaches of the subcontract agreement of $349,747.00. The surety-defendant is alleged to be responsible with defendant and it in turn has cross-complained against Concreto under the indemnity clause of the Performance Bond.

■ The defendant, Concreto, instituted a counterclaim against the joint venture setting out five causes of action. The first and third are shown to have been settled by the parties in the "Pre-Trial Order" of September 24, 1962 as was the sixth cause of action in plaintiffs' complaint, so these matters are moot and will no longer be considered.

The second and fifth causes of action in the counterclaim, although not shown to have been dismissed in the Pre-Trial Order, were dismissed by agreement as set out in defendant's brief (P. 16) and are therefore moot.

The counterclaim therefore maintains claims for damages arising out of the fourth cause of action for loss of potential profits in the sum of $63,720.00 as a consequence of plaintiffs' "unjustified" termination of their contract with Concreto.

The United States, for the use of Concreto, cross-complained under the authority of the Miller Act against the joint venture and United States Fidelity & Guaranty Company for damages in the sum of $54,664.75 plus interest, as the price of ready mixed concrete furnished the plaintiffs by Concreto pursuant to the subcontract, which plaintiffs admitted receiving and not paying for as they are claiming it as a set-off against their claim against Concreto.

Concreto has joined the United States Fidelity & Guaranty Company as a co-cross-defendant under its responsibilities arising out of a Payment Bond guaranteeing payment by plaintiffs and the United States Fidelity & Guaranty Company has cross-complained against the plaintiffs on the indemnity clauses of its Payment Bond and against Concreto on the indemnity clause of its Performance Bond. Neither plaintiffs nor defendant have resisted the cross-complaint of United States Fidelity & Guaranty Company.

I

The plaintiffs' first cause of action is based upon the allegations that defendant, Concreto, failed to comply with Paragraphs 12–09(b) (3)b, 12–09(c) and 12–09(c) (2) of the concrete specifications of the contract and as a result thereof, the Contracting Officer issued a stop order on concrete operations on the 12th day of January, 1960 which was in effect for a two-week period from January 13, 1960 to January 29, 1960 to plaintiffs' damage in the sum of $15,000.00.

The testimony does not support plaintiffs' position. Colonel Robert D. Brown, Jr., Contracting Officer for the Panama Canal Company who issued the stop order in a letter of January 12, 1960 written to the plaintiffs, wrote that the shutdown was the result of plaintiffs' "poor management". His testimony given by deposition during the trial was emphatically to the effect that he and the engineering and inspection officers were not satisfied with the supervision that the "contractor", plaintiffs, "was providing or his planning or his management at that time."

■ This position assumed by the Contracting Officer supplemented by other proof and in the absence of any showing to the effect that he was acting arbitrarily or capriciously, thoroughly establishes that plaintiffs were at fault and preclude recovery.

■ It appears that Concreto's equipment failed to meet some of the specifications and these failures were enumerated in the letter of January 12, 1960. This

does not relieve plaintiffs, however, for this was only a part of the reason for delay if there was an actual delay as much of the equipment and personnel were used at other places on the job during the stoppage of concrete operations. Proof later introduced and considered as to the claim for general delay sustains the position of defendant that no actual over-all delay was occasioned.

 As there was a stoppage and assuming, arguendo, that there was a delay, plaintiffs' contribution to it would preclude recovery as the courts have refused to apportion damages between a plaintiff and a defendant when both are responsible for the delay. See Jefferson Hotel Co. v. Brumbaugh, 4 Cir., 168 F. 867; Caldwell & Drake v. Schmulbach, 4 Cir., 175 F. 429; Greenfield Tap & Die Corp. v. United States, 68 Ct.Cl. 61, Supreme Court denial certiorari, 281 U.S. 737, 50 S.Ct. 333, 74 L.Ed. 1152.

## II

In their second cause of action plaintiffs complain that on or about the second half of December 1960 defendant, Concreto, S. A., failed to adequately and satisfactorily supply the ready mixed concrete as required by the applicable specifications and as a consequence thereof, the Contracting Officer demanded compliance and did not approve the methods defendant had been employing. The plaintiffs therefore, because of the Contracting Officer's disapproval of Concreto's concrete plant as a source of supply, were compelled to suspend work on the water piers until they imported and set up a concrete plant which would meet specifications.

The suspension extended from January 3, 1961 up to and including April 3, 1961 and because of the suspension plaintiffs claim damages of $180,000.00. Plaintiffs estimate that had the specified concrete been available for incorporation into the water piers, the joint venture would have been able to complete the substructure by the end of August, 1961 and that it was delayed until October 31, 1961.

Plaintiffs' witnesses as to the delay claimed are not convincing as against the proof offered by the defense.

Elmer Stevens, Resident Engineer, and William Brooks, Contract Administrator, employees of the Panama Canal Company after a detailed study of the progress of the construction and the preparation of careful charts as to the progress came to the conclusion that there was no delay.

Stevens testified at the first hearings in the case to the effect that "in my opinion there was certainly some delay" but after a careful study of their diaries containing their project notes together with charts prepared by Brooks, he reversed his testimony at a subsequent hearing and stated "When I was here in September, I had been totally unable to make the detailed study that has since been made and which has taken quite a long time." He then told how certain parts of the project were dependent upon completion of other parts and declared, "I therefore must testify that I see no delay to the completion of the project due to the shutdown of the concrete plant."

██ This testimony together with the charts themselves, demonstrating the progress achieved, establish that there was no delay so no recovery is permitted under plaintiffs' second cause of action.

## III

In the third and fourth causes of action the plaintiffs claim that by reason of the Contracting Officer's disapproval of Concreto's concrete plant as a source of concrete mix for the "important main and anchor piers" as set out in his letter of January 4, 1961, the plaintiffs were compelled to purchase in the United States a complete "job site" automatic concrete plant with the necessary additions and special features in order to comply with the specifications of the Prime Contract. The excess cost to plaintiffs for the purchase, transportation and assembly of the plant and accessories and the batching, mixing and delivery of concrete mix is alleged to be $90,747.00.

Plaintiffs allege that as it manufactured its own concrete in its central mixing plant, it was compelled to procure Type II cement required in the contract at $1.74 per sack rather than at the price of $1.44 per sack as specified as the cost of cement to plaintiffs as a result of supply by defendant under its terms.

The defendant in defense of its position relies upon a letter dated July 22, 1959 written to Fruin-Colnon Contracting Company, 48 Park Road, Burlingame, California and signed by Concreto, S.A. by L. Martinz, President. Defendant says that this letter became a part of the subcontract between the parties by reference as the subcontract on the second page contains in parentheses in the second paragraph the language "(refer to supplier's letter of July 22, 1959)."

Defendant says that in this letter it agreed only to erect a batching plant on pier 7 of certain dimensions and description as set out in the letter and it did not agree to do more than that. Its position is that the construction of the job site automatic plant was not done within the terms of the contract.

Defendant argues that the term "ready mix concrete" as used in the subcontract is ambiguous without referring to the letter of July 22, 1959 which really defines this term to mean "transit mixed concrete" as used in defendant's letter.

The defendant's position is incorrect and the letter is merely a part of the negotiations leading up to the signing of the final contract on August 5, 1959 entitled Purchase Order No. ——, Job No. 5955 with Form No. LF 11 attached and is not incorporated in this contract by the reference. The reference serves to explain the purpose of the "front end loader" in stockpiling aggregates and nothing more.

The purchase order says nothing about incorporating the letter or any other negotiations in its terms but is and purports to be the contract complete as long as the concrete was furnished within "covering requirements of the Concrete Section of the specifications dated April, 1959, prepared by Engineering and Construction Bureau, Panama Canal Co."

As argued by plaintiffs, the subcontract covers all of the matters covered in the letter of July 22nd "in the final content and form agreed upon by the parties weeks after the letter. To the extent the subcontract is consistent with Concreto's letter there would be no purpose in incorporating it; to the extent they are inconsistent, the subcontract obviously represents the agreed upon resolution of difference."

"In the absence of mistake or fraud, a written contract merges all prior and contemporaneous negotiations in reference to the same subject, and the whole engagement of the parties and the extent and manner of their undertaking are embraced in the writing. *The written agreement, and not the correspondence which preceded it, is the correct exponent of the contract.*" 12 Am.Jur. Sec. 232, page 756. (Italics supplied.)

Ready mixed concrete is not an ambiguous term as it embraces both transit mixed and central plant mixed and is a term well known and understood in the construction industry.

"There is judicial authority supporting the rule that a writing is to be interpreted in the sense in which the promisor has reason to know that it is understood by the other party where the writing is ambiguous, but only where it is ambiguous. It has been said that "the rule has never been recognized as authorizing the interpretation of plain and unambiguous language of a written instrument in accordance with any other meaning than that indicated by the words used in the instrument." 12 Am.Jur. Sec. 231, page 755.

The covering requirements of the specifications without doubt contemplate the use of other than "transit mixed" con-

crete in their very clear language in Section 12–09, paragraph (c) where it is stated:

"*Concrete Mixers.* Mixers may be stationary mixers or truck mixers of approved design"

and further in Section 12–09, paragraph (c) (2) where the use of "transit mixed" concrete is limited by

"*Truck Mixers.* Truck mixers may be used when authorized by the Contracting Officer and the equipment and methods are approved in writing."

The Contracting Officer permitted the use of the batching plant for over a year in spite of the defects and problems that were constantly occurring. This activity embraced only land pours and construction leading up to the important and hazardous pours for the "water piers" and the evidence is conclusive that every opportunity was given to the defendant to demonstrate that its equipment and manner of operation would be satisfactory when the time came for making the pours for water piers #3, #4, #5, and #6, and the higher column lifts and cap of pier #7.

The time never came when satisfactory performance was demonstrated although numerous changes were incorporated after lengthy correspondence and numerous conferences.

Toward the end of a year of testing the Contracting Officer wrote to Mr. W. M. Cathey, Project Manager of Fruin-Colnon International, S.A.—LeBoeuf & Dougherty, Inc. by letter of December 8, 1960, and after quoting Paragraph 12–03 of the Specifications to emphasize that the concrete mixtures will be designed by the Contracting Officer who will determine the required quality of the concrete for the structure, he stated:

"Due to the inadequacy of the physical means of adding water and the general unsatisfactoriness of the transit mix trucks which you pointed out (and to which we agreed)

as well as other factors, the consistency of concrete arriving on the job has not been uniform and has even varied from very wet to very dry in the same trucks. Our inspectors in attempting to overcome equipment inadequacy through the doctoring up of mixes with water after they arrived, have not been able to produce a mix which is consistent from truck to truck or is consistent in the same truck. Slumps have varied from 2 inches to more than 7, a situation which will not again be permitted."

(Slump is a term of art and refers to a manner of testing the consistency of the concrete.)

In the ending paragraph of the same letter the Contracting Officer said:

"It should be further understood that this agreement applies to concrete delivered by land, and it does not at this time apply to concrete to the water piers by some scheme not yet approved. That is a separate subject and can be resolved at such time as you submit your scheme for the concreting operations in the water. *This water plan must be based upon the use of a central plant set up which has physically proven its ability to meet the minimum contract specifications which no plant has so far been able to do.*" (Italics supplied.)

On January 3, 1961 the Contracting Officer announced his final decision that he would not permit the use of the "existing plant" on the main and important anchor piers but only on the remaining small pieces of land structures. He followed his announcement with a letter dated January 4, 1961 addressed to Mr. Cathey as Project Manager for plaintiffs in which he complained that the last pour made at Pier 7 for the third lift was "again far short of acceptable standards for concrete production and placement." He said that the output per hour "was not up to specification requirements (and in fact has never been)."

The letter stated that it was the "worst" pour to date due principally to the "extremely unreliable concrete operation."

The letter in addition to reciting the tolerance the Contracting Officer had exercised in permitting the long period of proof recites in detailed paragraphs the defects of the operation and points out that the defendant's president, Mr. Louis Martinz, stated that he was unable to meet the "consistency requirements with his truck mixers."

The decision of this officer was made after over a year of careful testing and close inspection and has none of the earmarks of despotism or caprice. No evidence was introduced that he was acting in an arbitrary nor capricious manner except defendant's insistence that it was capable of providing the concrete at the contract and necessary rate, which was never established.

Under the Purchase Order—Terms and Conditions—Form No. LF–11, paragraphs 6 and 11, the following provisions were made:

"6. DEFAULT: The Buyer, by written notice to the Seller, may terminate the whole or any part of this Order if the Seller (1) fails to make any deliveries as required hereunder; or (2) so fails to make progress as to endanger, in the opinion of the Buyer, the performance of this Order in accordance with its terms.

"In the event of termination pursuant to this paragraph 6, the Buyer shall have the right, in addition to any other rights conferred by law, to procure upon such terms and in such manner as the Buyer may deem appropriate, the materials similar to those terminated and the Seller shall be liable to the Buyer for any excess costs for such similar materials; provided, however, that the Seller shall continue the performance of this Order to the extent not terminated under the provisions of this paragraph, provided, further, that the Seller shall not be liable for any excess costs if the Seller's failure to perform this Order arises out of causes beyond the control and without the fault or negligence of the Seller. Causes beyond the control and without the fault or negligence of the Seller include, but are not restricted to, acts of God or of the public enemy, acts of the Buyer, acts of the Government in its sovereign capacity, fire, floods, epidemics, quarantine restrictions, strikes, freight embargoes and unusually severe weather."

"11. SELLER'S R E S P O N S I-BILITY: The Seller agrees to furnish the materials called for under this Order in strict accordance with the specifications and/or drawings referenced herein. The Seller agrees to assume toward the Buyer all the obligations and responsibilities that the Buyer assumes toward the Owner as set forth in the Contract, General Conditions, Drawings, Specifications referenced herein, insofar as applicable, generally or specifically, to the materials to be furnished under this order. All Drawings of the Seller must be submitted for approval of the Architect or Engineer through the Buyer's office."

■ These conditions in the subcontract clearly establish in the plaintiffs as the "Buyer" the right to terminate the "whole or any part of this order" if the "Seller", the defendant, fails to perform and to take such reasonable steps as may be necessary to comply with the "order" in conformance with the terms of the prime contract, with the right to look to the defendant for payment for "excess costs."

Subsequent to the termination of the use of the truck mixers on January 3, 1961 the plaintiffs and the defendant attempted to renegotiate the contract so that defendant could establish or try to establish a mixing plant that could furnish cement of the quality and at the rate necessary to meet the pouring of the water piers but no agreement was ever reached, and the plaintiffs were justified in purchasing and installing the "job

"site" plant described in the complaint and in buying the cement Type II at $1.74 per sack, when defendant no longer furnished it at $1.44, and may look to the defendant for the excess costs. The excess costs are in detail as follows:

| | | |
|---|---|---:|
| 1. | Excess cost of cement less salvage value of the concrete conveyor @ $1,100.00 | $ 33,140.04 |
| 2. | Purchase price of plant | $ 84,867.01 |
| | Purchase price of second mixer | 8,750.00 |
| | Purchase price of new equipment and material to adapt plant | 21,743.88 |
| | Cost of erecting plant @ $39,168.15, less cost of concrete base at $5,460.00 and less direct labor costs difference as determined by Price Waterhouse & Co. (Plf's. Ex. 72) @ $1,214.58 | 32,593.57 |
| | Cost of dismantling plant @ $3,138.58, less revised labor costs by Price Waterhouse & Co. (Plf's. Ex. 72) $152.69) | 2,985.89 |
| | Cost price of transformer for plant service | 2,720.25 |
| | Cost of operating plant @ $19,942.93, plus revised labor costs by Price Waterhouse & Co. (Plf's. Ex. 72) $488.54 | 20,431.47 |
| | | $206,961.39 |
| | Less salvage on plant | 55,000.00 |
| | | $151,961.39 |

By stipulation the parties agreed to deduct:

| | | |
|---|---:|---:|
| Estimated transportation included in shipment Mormacsurf | $1,200.00 | |
| Brand Dispatching Co. Inv. #3925 | 23.69 | |
| Brand Dispatching Co. Inc. #3482 | 33.39 | |
| Brand Dispatching Co. Inv. #3395 | 51.75 | 1,308.83 |

| | |
|---|---:|
| Net total of costs for plant and its operation to provide concrete for the water piers | $150,652.56 |
| Less amount that would have been paid for concrete to defendant under subcontract | $ 79,454.75 |
| Excess costs | $ 71,197.81 |

| | | |
|---|---|---:|
| 3. | Excess cost of cement (Item 1) | $ 33,140.04 |
| | Excess cost of plant (Item 2) | 71,197.81 |
| | Total | $104,337.85 |

IV

Plaintiffs' fifth cause of action after certain adjustments is reduced to a claim for the cost of the erection and dismantling of an auxiliary cement silo less the salvage value. The claim amounts to about $2,070.00 less about $800.00 salvage value.

Defendant's position that neither the subcontract nor the specifications required the silo, it was not requested by the defendant, and it was never utilized

during a pour is well taken and recovery is denied.

## V

The plaintiffs have heretofore in the pretrial conference admitted the obligation under the cross-complaint of the United States of America for the use of Concreto, S. A. under the Miller Act in the sum of $54,664.75 for concrete furnished the plaintiffs pursuant to the subcontract. Plaintiffs asked that this sum be allowed as a setoff against their claim against defendant.

The defendant claims that interest should be allowed from the dates that the payments amounting to the sum, when totaled, of $54,664.75 were due as it is a liquidated claim, but this is not allowed. The claim was not paid in anticipation of defendant's failure to perform its part of the subcontract and with the knowledge that it would be indebted to plaintiffs, which is confirmed in this opinion, and the findings attached. To allow defendant interest because its claim is liquidated and not to allow plaintiffs interest on its claim, which was proven and allowed, merely because it was unliquidated, would be manifestly unfair. The claims emanate from the same contract and arose contemporaneously so no preference should be made.

Judgment in the admitted sum of $54,664.75 will be allowed for the United States of America for the use of defendant to be applied as a setoff against the amount recovered of defendant by plaintiffs.

## VI

The defendant, Concreto, S. A., has counterclaimed against the plaintiffs in the sum of $63,720.00 representing potential profits which defendant states it failed to realize as a consequence of the alleged "unjustified" termination of Concreto's contract to provide ready mixed concrete for the main anchor and water piers and $8,400.00 for damages for plant equipment overhead for the time consumed by the plaintiffs beyond the work schedule.

The termination of the contract was the fault of the defendant counterclaimant as has been previously demonstrated and held in this opinion and as both of these claims arise out of this event, the counterclaim is denied and dismissed.

## VII

The United States Fidelity & Guaranty Company has brought cross complaints against the plaintiffs on the indemnity clauses of its Payment Bond and against the defendant on the indemnity clauses of its Supply Bond.

Judgment is granted therefore against Fruin-Colnon International, S.A. and LeBoeuf & Dougherty, Inc. under the indemnity clauses of the payment bond executed and issued on August 17, 1959 guaranteeing payment to all those who supplied labor and materials to the said Fruin-Colnon International, S.A. and LeBoeuf & Dougherty, Inc. on the contract herein in the sum of $54,664.75. The judgment shall be in favor of the cross-complainant, United States Fidelity & Guaranty Company and any amount collected by the defendant, Concreto, S.A. under the judgment for the same amount herein against the plaintiffs shall be credited as against their judgment, and it shall be diminished accordingly.

Judgment is granted also against Concreto, S.A. under the indemnity clauses of the supply bond executed and issued on August 17, 1959 guaranteeing the performance of the supply agreement herein in the sum of $104,337.85. The judgment shall be in favor of the cross-complainant, United States Fidelity & Guaranty Company, and any amount collected by the plaintiffs, Fruin-Colnon International, S.A. and LeBoeuf & Dougherty, Inc., under the judgment for the same amount herein against the defendant, Concreto, S.A., shall be credited as against their judgment and it shall be diminished accordingly.

In each of the bonds herein the plaintiffs and defendant respectively agreed to indemnify the cross-complainant against loss by attorney fees and court costs.

The attorneys herein for the cross-complainant, Icaza, Gonzalez-Ruiz & Aleman and L. S. Carrington, are allowed a fee of $1000 to be paid by the plaintiffs and $1000 to be paid by the defendant for which judgment shall be had against the plaintiffs and against the defendant respectively, and the cross-complainant shall recover from each of the parties any costs incident to maintaining its actions against each of them.

The attorneys for the parties have agreed to submit detailed Findings of Fact which, upon approval by the Court, will be adopted and made a part of this opinion in accordance with the Canal Zone rules.

A judgment in accordance with this opinion and the findings is directed to be prepared and entered.