367 F.2d 473
 The UNITED STATES of America, FOR the USE AND BENEFIT OF SHIELDS, INC., and Colonial Linoleum and Tile Company, Appellees,
v.
CITIZENS AND SOUTHERN NATIONAL BANK OF ATLANTA, GEORGIA, Executor of the estate of Ray M. Lee, Deceased, and The Travelers Indemnity Company, Appellants.
 No. 9832.
 United States Court of Appeals Fourth Circuit.
 Argued April 8, 1965.
 Decided October 6, 1966.
 
 Oscar Leach, Raleigh, N. C., and Donald D. Smith, Atlanta, Ga. (Smith, Leach, Anderson & Dorsett, Raleigh, N. C., and Smith, Swift, Currie, McGhee & Hancock, Atlanta, Ga., on brief), for appellants.
 Weston P. Hatfield, Winston-Salem, N. C., and James H. Walker, Raleigh, N. C. (Hatfield & Allman, Winston-Salem, N. C., and Lassiter, Leager, Walker & Banks, Raleigh, N. C., on brief), for appellees.
 Before HAYNSWORTH, Chief Judge, and BOREMAN and BRYAN, Circuit Judges.
 BOREMAN, Circuit Judge:
 
 
 1
 This action was brought under the Miller Act, 40 U.S.C.A. § 270b, by United States of America, for the use and benefit of Shields, Inc., and Colonial Linoleum and Tile Company, hereinafter referred to as plaintiffs,[1] against Ray M. Lee[2] and his surety to recover damages of $50,319.34 for an alleged breach of a certain contract and the unpaid balance of $34,666.34 due on the contract. Lee admitted liability for the unpaid contract balance and paid that sum into the court on November 5, 1963, but denied any liability for breach of contract.
 
 
 2
 The case was tried by the court. Specifically, the court found that Lee had breached the contract by wrongfully back-charging plaintiffs $2,400.39 for the use of certain hoisting facilities and by failing to coordinate the work of plaintiffs with that of another subcontractor on the job causing plaintiffs to incur additional costs of $44,561.26 in performing their contract. Interest at the annual rate of six per cent was allowed on the aggregate award of $46,961.95 from August 28, 1958, until paid. The court also allowed interest at the annual rate of six per cent on the unpaid contract balance from August 28, 1958, until November 5, 1963. Lee and his surety appeal from that portion of the judgment specifically awarding plaintiffs $44,561.26 plus interest.
 
 
 3
 Ray M. Lee was engaged in the general contracting business and on April 19, 1955, he entered into a contract with the United States of America (hereinafter Government) as principal contractor for the construction of a 500-bed hospital at Fort Bragg, North Carolina. The contract provided that the hospital was to be completed in October 1957, but the right to make changes in the contract plans and specifications was reserved by the Government and, should these changes cause an increase or decrease in the amount due under the contract or in the time required for its performance, an equitable settlement was to be made and the contract modified in writing. Before the project was completed the Government had made approximately one hundred changes, many of them of unusual scope and magnitude, which resulted in written modifications. Consequently, the time for completion was extended from October 1957 to September 2, 1958, and the contract price was substantially increased. The hospital was completed within the extended period and was accepted by the Government on August 29, 1958.
 
 
 4
 Lee, as general contractor, negotiated subcontracts with seventeen subcontractors, including plaintiffs, to perform various parts of the construction work. Under their subcontract plaintiffs were to furnish all material and perform all labor with respect to those portions of the prime contract pertaining to lathing, plastering, installing acoustical tile and resilient floors for the sum of $268,950.00. The subcontract, however, incorporated by reference the provisions of the prime contract and thus the Government had the right to change plans and specifications affecting the work performed by plaintiffs during the time construction was in progress. Of the approximately one hundred written change orders, twenty-seven affected the work to be performed by plaintiffs. After adjustments due to changes had been made plaintiffs were to receive the total sum of $415,096.51.
 
 
 5
 The portions of plaintiffs' work giving rise to the present litigation relate to the lathing and plastering work in certain rooms of the hospital where a ceramic tile wainscot, extending from the floor to a height of approximately five feet on each wall of the room, was to be installed by another subcontractor (hereinafter tile subcontractor). While portions of plaintiffs' complaint used broad and general language which would have included the work of other subcontractors, the evidence introduced by plaintiffs at the trial related principally to the tile subcontractor and the asserted damages related entirely to work performed in the rooms in which the ceramic tile wainscot was installed. These rooms included bathrooms, kitchens, alcoves and janitor closets throughout nine floors and separate units of the hospital. As elsewhere, these rooms were first "framed out" by plaintiffs' lathing crew. After the lathing was substantially completed the electrical and mechanical trades installed the electrical wiring, ventilating system and other necessary equipment in the unfinished walls and ceilings. Next came a preliminary plastering cycle where plaintiffs' plastering crew applied a base coat of plaster to that portion of the walls not covered by the tile wainscot and to the ceilings, and a thin coat of special plaster to those areas over which the ceramic tile was to be installed. After the plaster had dried the tile subcontractor came in and installed the ceramic tile wainscot. Once the tile work was completed the plaintiffs' lathing crews had to return to these rooms to apply "beads" (metal strips to round the corners of the rooms) and do other minor work. Then, the plaster crew returned to apply a finished coat of plaster on the walls from the top of the wainscot to the ceiling in such a manner that the surface of the finished coat of plaster would be flush with the surface of the tile.
 
 
 6
 According to plaintiffs, the tile subcontractor did not timely perform his work and the failure to do so interrupted the normal work schedule of plaintiffs' plaster and lath crews, who, as a result, were compelled to move material and equipment from one area to another and from one floor to another thus causing plaintiffs to incur additional costs of $44,561.26 over and above those reasonably estimated and anticipated when the contract was executed. The complaint asserted that the failure of Lee to properly coordinate the tile subcontractor's work with the work of plaintiffs constituted a breach of the express terms of the contract and breach of an implied condition imposed by the normal customary usages and procedures of the trade. At the trial plaintiffs did not rely upon the expressly alleged terms of the contract to show the claimed breach, but offered testimony to show that on construction projects of the size and type involved, the custom and usage of the plastering trade normally permitted a contractor to schedule and program the work so that it could be substantially completed in large areas, if not the total area, of an entire floor in order to avoid the expense and inconvenience of transferring crews, equipment and material from one area or floor to another as the work progressed. Plaintiffs contended that if Lee had required the tile subcontractor to timely perform the tile work, their plastering crew could have doubled back and put on the finishing coat of plaster above the tile wainscot before moving to another area or floor.
 
 
 7
 Lee strenuously objected to the testimony introduced by plaintiffs as to the custom and usage of the plastering trade, contending that such was immaterial as it was in conflict with the written contract. The trial court, however, held that the normal procedures of the trade must be followed "in the absence of specific provisions of the contract to the contrary," thereby making the custom in question an implied condition of the contract. The court found that this implied condition had been breached by Lee's failure to coordinate the progress of plaintiffs' work with that of the tile subcontractor and that this failure caused unreasonable and unforseeable interruptions which forced plaintiffs to move materials, equipment and workmen from one area to another and from one floor to another, resulting in additional costs.
 
 
 8
 Here, Lee contends that the lower court erred as a matter of law in finding that Lee breached an implied contractual duty imposed by the custom and usage of the trade. To support his contention he cites an early decision of this court applying North Carolina law, Lamborn v. Woodard, 20 F.2d 635 (4 Cir. 1927). Plaintiffs, however, take the position that the contract was silent as to the manner in which the work was to be performed and that the lower court was correct under North Carolina law in considering the normal custom of the trade as an implied contractual condition. Plaintiffs cite Phillips v. Phillips Construction Company, 261 N.C. 767, 136 S.E.2d 48 (1964); McDearman v. Morris, 183 N.C. 76, 110 S.E. 642 (1922); and Cohoon v. Harrell, 180 N.C. 39, 103 S.E. 906 (1920), as supporting their position.
 
 
 9
 We agree that the substantive law of North Carolina must be applied in determining the respective rights of the parties. Even though jurisdiction is conferred by the Miller Act, the construction of that statute is not at issue and all acts relevant to the subcontract in question and its performance occurred in North Carolina. See Wells Benz, Inc. v. United States, 333 F.2d 89 (9 Cir. 1964); Continental Casualty Co. v. Schaefer, 173 F.2d 5 (9 Cir. 1949); United States for Use and Benefit of Lichter v. Henke Const. Co., 157 F.2d 13 (8 Cir. 1946).
 
 
 10
 The North Carolina law as to to custom and usage is stated in the Cohoon case, supra:
 
 
 11
 "It is the accepted principle, here and elsewhere, that a lawful and existent business custom or usage, clearly established, concerning the subject-matter of a contract, may be received in evidence to explain ambiguities therein, or to add stipulations about which the contract is silent, and, further, where such a custom is known to the parties, or its existence is so universal and all-prevailing that knowledge will be imputed, the parties will be presumed to have contracted in reference to it, unless excluded by the express terms of the agreement between them. * * *" (103 S.E. at 906).
 
 
 12
 When the contract in question is read in light of Cohoon, we think the court below correctly held that the custom of the trade was an implied condition of the contract. The contract does not specifically exclude custom and usage and Lee can point to only one phrase in it which, he contends, covers the manner in which plaintiffs were to perform their contract. This phrase is found in the following paragraph:
 
 
 13
 "The Sub-contractor further agrees to satisfactorily complete all work under this contract in accordance with construction progress unless extensions of time, due to delays on account of conditions beyond the power of the Sub-contractor to control, is applied for by the Sub-contractor, and granted by the Contractor. Such application or extension of time must be made in writing within one week of the occurrence causing the delay." (Emphasis added.)
 
 
 14
 The context in which the underlined phrase in the above quotation is used clearly required plaintiffs to perform their work as the construction normally progressed. This they must have done since the hospital was completed within the prescribed time period, as extended. However, we think the phrase would not admit of the broad construction which Lee urges us to place upon it. The ground of recovery is based on the theory that Lee negligently failed to coordinate the work of the various subcontractors, particularly the tile subcontractor, in a normal, usual and customary manner, and it was this failure which resulted in additional costs to the plaintiffs. If the phrase was, in fact, intended to cover this situation, it is ambiguous and the District Court, in applying North Carolina law, was free to consider evidence of custom and usage.
 
 
 15
 Lee next argues that the testimony of plaintiffs' witnesses did not show the existence of a custom in the plastering trade which permitted a contractor to perform his work in large areas or sections or on a floor-by-floor basis. The question as to the existence of such custom, however, was a question of fact to be decided by the trier of fact. T. C. May Co. v. Menzies Shoe Co., 186 N.C. 144, 119 S.E. 227 (1923); McDearman v. Morris, 183 N.C. 76, 110 S.E. 642 (1922); 2 Williston on Contracts § 662 (1920). The court found from the evidence that such a custom did exist and based on the evidence in the record we cannot say that this finding was clearly erroneous. F.R.Civ.P. 52(a).
 
 
 16
 Lee next contends that, even though this court should determine that his failure to coordinate the work caused the plaintiffs to incur some unanticipated and unnecessary costs, certain of the costs included in the award of $44,561.26 were attributable to factors other than his failure to coordinate for which he was not responsible. He argues that, as there was no reasonable basis for allocation of damages between actionable and nonactionable factors, the entire claim should have been disallowed. We so hold on this record.
 
 
 17
 The court below made certain findings of fact and assigned reasons for the disallowance of certain items claimed by plaintiffs, such as $847.00 for extra plaster, $1,589.74 for extra lathing where "Lawson tubes" were to be installed, $500.00 for changes in one particular wing of the hospital, and $420.75 for "cleaning up." However, the finding of additional labor and other costs in the amount of $44,561.26 due to Lee's failure to properly coordinate the work is nothing more than a generalized recitation that additional labor costs were incurred by the plaintiffs because they were required to move from one area to another and back, they were required to work in piecemeal fashion "in various sections of the building," they were prevented from planning their work, they were forced to employ and discharge employees on an irregular and unpredictable basis and they were required to transfer supervisory personnel to and from the subject project. In this general finding there is no disclosure of the method, if any, employed in calculating increases in costs or of any reviewable basis employed by the court in arriving at the amount of the award.
 
 
 18
 From our examination of the rather inadequate record it appears that plaintiffs attempted to compute their additional costs by comparing the average labor cost per square yard of lath and plaster installed before October 1, 1957, with the average labor cost per square yard of lath and plaster installed thereafter. October 1, 1957, was used because practically all the plaster work in the rooms with tile wainscot was performed after that date. To arrive at average labor cost of work done before October 1 the plaintiffs took the total labor cost as shown by the payrolls for the lath crew and the plaster crew and then divided the respective total labor costs by the number of square yards of lath and plaster completed before October 1. The figures used as the number of completed yards of lath and plaster were based upon an invoice submitted by plaintiffs to Lee for payment and which Lee had paid. Total labor costs for the lath and plaster crews for work after October 1 were then taken from the payrolls. From the total wages paid after October 1 were subtracted figures for the respective lath and plaster crews which supposedly represented what the labor costs should have been based upon pre-October 1 figures. These figures so subtracted were determined by multiplying the number of square yards of lath and plaster work done after October 1 by the average labor cost per square yard of work done before October 1. The total wages paid after October 1 to the respective crews less the above deduction for each crew were claimed by plaintiffs as additional labor costs caused by the late performance of the tile work. The added cost for the plaster crew computed in the above manner was $21,951.95 and for the lathing crew was $4,582.84. To these figures plaintiffs added the salaries and travel expenses of their supervisors, payroll taxes, insurance, overhead and profit percentage to arrive at the total of $44,561.26.
 
 
 19
 Despite the broad allegations of the complaint plaintiffs frankly admitted that they were not seeking damages for delay but only the additional costs actually incurred by reason of the fact that they were required to move their material, equipment and workmen from area to area or from floor to floor as a result of Lee's failure to coordinate the work. Based on this theory it is difficult to understand how any substantial portion of the added labor cost for the lath crew could be charged to Lee. The evidence shows that in pursuing the normal work cycle the lathing crew came into an area and substantially completed it. The title work was not to be performed until after the lath had been installed and after a base coat of plaster had been applied. There is no persuasive evidence to show in what respect the lath crew was caused extra work by the subcontractor's tardiness in installing tile. If this figure for the extra labor cost for the lath crew was based on the theory that the crew had to return to the rooms where the tile was to be installed and that this was wholly responsible for the extra cost, such a theory must be rejected for the undisputed evidence clearly reveals that the lath crew would, under any circumstances, have had to proceed to other areas and floors and return to these rooms. The work cycle followed in the construction process compels such a conclusion. After lath was installed a period of time was allowed for other subcontractors to install electrical wiring, ventilating systems and other equipment in the unfinished walls and ceilings. Mr. Shields, the president of Shields, Inc., stated that the maximum time required for this work was from four to six weeks. After other subcontractors had finished their installations plaintiffs' plaster crew moved in to apply the base coat of plaster to the walls and this operation required a substantial amount of time. Once the walls were plastered there followed a drying period of from five to ten days. Next the tile subcontractor was normally expected to do his work. Once the tile work was done the lathing crew returned to apply the "beads" and do other minor finishing. Taking into consideration the total time elapsed from the time the lath crew first framed out the rooms until they returned to apply the "beads" it is clear that this crew would go to other floors or areas and then return to these rooms where the tile was to be installed irrespective of the coordination of the work by Lee. We conclude that Lee cannot be charged with the additional costs, including both labor and supervisory costs, of having to return to these small areas when the lath crew would have had to return in any event. The claim for added costs in this connection appears to be based primarily on a delay theory which plaintiffs have repeatedly disavowed as a basis of recovery.
 
 
 20
 In certain aspects the evidence on the the material issues to be determined was conflicting and these conflicts were not specifically resolved by the court below or, at least, any such resolutions are not apparent from the generalized finding to support the award. From our examination of the record, certain facts appear to be clearly established.
 
 
 21
 Obviously at least four factors for which Lee was not responsible contributed to the additional costs. First, irrespective of the time when the plaintiffs' work was done in those tiled rooms the labor cost per square yard would necessarily be greater than in other areas because the rooms were small and the work could not proceed as rapidly; also, the work had to be done with great care and precision because the corners had to be perfectly squared and the surface of the wall over which the tile was placed had to be perfectly smooth. In large areas and even in some small areas such was not the case. The testimony revealed that in areas where no tile was to be installed the work was acceptable so long as faults were not visible to the naked eye.
 
 
 22
 A second factor which clearly contributed to the additional cost in these areas was the careless workmanship of plaintiffs' plastering crew. The undisputed evidence shows that this crew had to return to several of these rooms which were to be tiled to square the corners and smooth the wall surfaces after the initial coat of plaster had been applied and after the tile subcontractor had arrived.
 
 
 23
 A third cost factor was the number and nature of change orders instituted by the Government. It would be wholly unreasonable to hold Lee liable for any interruptions resulting from these changes because the contract between Lee and plaintiffs specifically reserved the right to change the work during the construction process. In addition, plaintiffs were supposedly compensated for any increase in costs incident to such changes. The Government instituted approximately one hundred change orders which clearly affected plaintiffs' work in one way or another. First, change orders which did not directly affect the work of plaintiffs but did affect the work of other subcontractors undoubtedly indirectly caused some of the interruptions in plaintiffs' work and necessitated moving materials and supplies to other areas or floors before plaintiffs were ready to leave the particular area where they were then working. Second, a number of the change orders directly affected the work to be done by plaintiffs. It would appear that the effect of these change orders on the asserted additional costs cannot be measured with precision and it is clear from the evidence that some of them did require plaintiffs to stop work in a particular area and move to another.
 
 
 24
 The last factor which definitely tended to increase the cost after October 1 was the nature of the work performed in areas other than in the rooms where the tile was installed. Approximately 90% of the plaster work had been completed by October 1, 1957, according to plaintiffs' evidence. The remaining 10% included the rooms where the tile was to be installed. Part of the labor cost incurred by the plaster crew after that date, however, was attributable to going back to "touch up" areas which had been damaged by other subcontractors and for completing certain small areas other than the tiled rooms. The cost per square yard for the "touch up" jobs and completing these small areas would necessarily exceed the cost per square yard for the larger areas completed before October 1. The failure to complete these small areas, the evidence reveals, was not attributable to any fault of Lee. As plaintiffs' own witnesses stated, even in the ideal situation only 95% of the work could be completed in an area when the plaster crew first went through the building.
 
 
 25
 On the whole record it appears that a not insubstantial part of the extra cost for which plaintiffs sought reimbursement could be attributed to factors for which Lee was not responsible. As the evidence does not provide any reasonable basis for allocating the additional cost among these contributing factors we conclude that the entire claim should have been rejected. See Lichter v. Mellon-Stuart Co., 305 F.2d 216 (3 Cir. 1962). This court has heretofore recognized and applied the principle that if there are actionable and nonactionable factors, the court, in the absence of a showing of some reasonable basis in the evidence, will not attempt to apportion the damages. Schmulbach v. Caldwell, 196 F. 16, 27 (4 Cir. 1912); Jefferson Hotel Co. v. Brumbaugh, 168 F. 867, 874 (4 Cir. 1909). For other cases on this and related issues see Annots. 152 A.L.R. 1349 and 115 A.L.R. 65. See also Fruin-Colnon International, S.A. v. Concreto, S.A., 231 F.Supp. 14 (D.C.Canal Zone 1964). We have not found and our attention has not been directed to any North Carolina cases on this point.
 
 
 26
 For the reasons stated the judgment below will be vacated and the case remanded for entry of judgment for the defendants.
 
 
 27
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 Shields, Incorporated, and Colonial Linoleum and Tile Company, North Carolina corporations, entered into the contract in question as joint venturers. It was understood that Shields was to do the lathing and plastering work and Colonial was to install the acoustical tile and resilient flooring
 
 
 [2]
 The complaint named Ray M. Lee Company, a Georgia corporation, and its surety, The Travelers Indemnity Company, as defendants. A joint answer was filed by Lee, trading as Ray M. Lee Company, and the surety, and the litigation proceeded on the basis that Ray M. Lee individually rather than Ray M. Lee Company was the proper party defendant. Following the death of Ray M. Lee on June 17, 1964, a consent order substituting the Citizens and Southern Bank, Executor of the estate of Ray M. Lee, as party defendant in the place of the deceased was entered below. Upon request we have entered an appropriate order substituting, on appeal, the Citizens and Southern National Bank of Atlanta, Georgia, Executor of the estate of Ray M. Lee, deceased, in the place and stead of "Ray M. Lee Company" or Ray M. Lee