G. C. S., INC. and I. S. C.,
Inc., Plaintiffs,

v.

FOSTER WHEELER CORPORATION,
Defendant.

FOSTER WHEELER CORPORATION,
Plaintiff,

v.

G. C. S., Inc. and I. S. C., Inc.,
Defendants.

Civ. A. Nos. 94–71 ERIE, 4–72 ERIE.

United States District Court,
W. D. Pennsylvania.

Aug. 15, 1977.

See also, 437 F.Supp. 757.

Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for plaintiffs.

Shanley & Fisher, Newark, N. J., for defendant.

## OPINION

WEBER, Chief Judge.

These two actions are cross actions which arise out of the same contract and involve the same extensive mass of facts. Civil Action No. 4–72 Erie, Foster Wheeler Corporation vs. G.C.S. and I.S.C. was filed in New Jersey and transferred to this District under 28 U.S.C. § 1441 because of the location here of the essential operative facts. It was a non-jury action. Civil Action No. 94–71 Erie, was an action by G.C.S. and I.S.C. against Foster Wheeler brought in this district with a demand for jury trial. The cases were consolidated for pretrial purposes. The cases were consolidated for trial and the court submitted the entire case to the jury under special interrogatories which would provide an advisory verdict in the non-jury action at Civil Action No. 4–72 Erie.

The cases arise out of the construction of additions to an oil refinery owned by Pennzoil United, Inc. at Rouseville, Pennsylvania. Foster Wheeler was the general contractor for the project, and G.C.S. was its subcontractor for the construction and installation of concrete foundations, paving, underground electrical installation and underground piping. G.C.S. also performed some other subcontracting work by separate contracts, such as site clearance and the construction of masonry buildings which were not subject to the provisions of the time limits which are critical here, and thus not relevant to our present consideration.

Foster Wheeler had contracted with Pennzoil to complete the mechanical installation of the additions to the refinery by January 31, 1971. The subcontract between Foster Wheeler and G.C.S. called for G.C.S. to start its work on April 1, 1970 and substantially to complete all foundations, underground electrical and piping, backfill and paving, by June 30, 1970, or within 90 days. This work was not completed until after November 1, 1970.

The main thrust of Foster Wheeler's claim was that the continued presence of G.C.S. on the job site after September 1, 1970, and its failure to have substantially completed its subcontract work on foundations, underground electrical and piping, backfill and paving, interfered and delayed the start of Foster Wheeler's scheduled above-ground steel erection and piping. It was contended that this delay prevented Foster Wheeler's efficient start of its above-ground steel erection and pipe installation for two months and required Foster Wheeler to perform its major construction work during the worst winter months when Foster Wheeler was unable to obtain a sufficient crew of pipefitters because their efficiency, productivity and reliability of attendance was severely hampered because of the impact of severe winter weather on the performance. Foster Wheeler argues that as a direct and proximate result, Foster Wheeler's above-ground piping operations took four months longer to complete than was originally scheduled and that as a result Foster Wheeler incurred direct additional out-of-pocket costs in the amount of $637,482.00.

The advisory jury was given three interrogatories addressed to this issue, and answered them as follows:

A. THE FOSTER WHEELER CLAIMS

    1. Was Foster Wheeler caused to incur additional costs in its above-ground piping program because of delays of GCS for which GCS may be held responsible in its performance of the contract for foundations, underground piping and electrical work backfill and paving?

    ANSWER       YES
               (Yes)   or   (No).

If your Answer to No. 1 is Yes, answer No. 2.

    2. Is there a reasonable basis in the evidence for determining how much of Foster Wheeler's extra costs in its above ground piping resulted from delays caused solely by GCS exclusive of other causes?

    Answer       YES
             (Yes)   or   (No).

If your Answer to No. 2 is Yes, answer No. 3.

3. What is the amount of damages suffered by Foster Wheeler in its pipe installation program which was caused solely by GCS?

$ 159,371.00

Thus, the jury concluded that Foster Wheeler suffered a one-month period of additional expense due to delay caused by G.C.S.

G.C.S. now argues that Foster Wheeler experienced no delay which was caused by G.C.S.; that the evidence establishes reasons that account for all significant delays to job progress aside from any fault of G.C.S., and that the evidence does not provide any reasonable basis for allocating damages to any various delay causing events.

## THE APPLICABLE LAW

The ruling case law provides that where the cause and the fact of damages have been established, a party is not to be denied damages because they are difficult to determine with mathematical precision. *Story Parchment Co. v. Paterson Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 [1931]. It is sufficient if the evidence provides a reasonable basis to determine the extent of damages. *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 [1946]. More specifically applicable to this case is the rule applied to a construction contract where there were multiple causes for delay. In *Lichter v. Mellon-Stuart*, 193 F.Supp. 216 [W.D.Pa.1961], aff'd. 305 F.2d 216 [3d Cir. 1962], the court faced the problem of the apportionment of damages based upon the inability to provide a reasonable basis for allocating certain damages between actionable and non-actionable causes of delay. Plaintiff proved the actual cost of performing the masonry job as delayed and interrupted by various causes, and the calculated cost of performing this work without delay, and claimed the difference as damages. This amount was not allowed because the evidence submitted did not provide any reasonable basis to allocate this damage between those for which the defendant was responsible and those for

which he was without blame. However, as to one particular item, the trial court found that there was a reasonable basis for the allocation of 42 days to the replacement of certain stone work made necessary because of negligent installation by the defendant. The court then took 42 days of the claimed delay time of 68 days and found 42/68 of the total claimed loss of $10,332 to be properly allocable to the item for which defendant was responsible.

The Court of Appeals affirmed:

"The court undertook such an allocation, guided by evidence concerning the extra time required for the performance of the stone contract as the result of improper shelf angles. We cannot say that this was an arbitrary method of allocation." 305 F.2d 216 at p. 221.

Also in *United States v. Citizens and Southern National Bank*, 367 F.2d 473 [4th Cir. 1966], a subcontractor claimed that its costs had increased due to the general contractor's breach of an implied duty to permit the subcontractors to schedule and program their work so that it could be done efficiently. The trial court awarded plaintiff its increased costs attributed to the delay. The Court of Appeals, however, found that certain parts of the delay were due to other factors than the defendant's failure to coordinate the work. Thus, although a part of the delay was attributable to defendant, the lack of sufficient evidence to determine the specific damages for which the defendant was exclusively responsible, was fatal to the claim:

"This court has heretofore recognized and applied the principle that if there are actionable and non-actionable factors, the court, in the absence of a showing of some reasonable basis in the evidence, will not attempt to apportion the damages." 367 F.2d 473 at p. 480.

In *Chalender v. United States*, 119 F.Supp. 186, 127 Ct.Cl. 557 (1954), where the contractor alleged that government delay caused the contractor's delay and resulting loss, the Commissioner found that while there were other causes of delay not the

fault of the government, this factor should not prevent an allocation:

> "It would be impossible to assign particular days of delay to one of the two categories, Government's fault or concurrent, as defendant has attempted to do. This is so because much of the work overlapped, and there was only one period where all work stopped completely. However, we do not believe that this difficulty should operate to bar plaintiff from all recovery." (119 F.Supp. p. 191)

The Commissioner allocated one-half of the total delay damages to the Government's fault. Similarly, in *J. D. Hedin Construction Co. v. United States*, 347 F.2d 235, 171 Ct.Cl. 70 (1965), the Court of Claims found that where the exact amount of damages for delay due to the Government's fault was difficult, if not impossible to determine, the "total cost" method of computation of damages was proper and that an allocation of these damages is a determination of fact where some part of this delay was due to the fault of the Government.

In *Boyajian v. United States*, 423 F.2d 1231, 191 Ct.Cl. 233 (1970), the court determined that a "total cost" method of proof of damages was not applicable unless the plaintiff can prove that all of the damages claimed resulted from and were caused by defendant's breach. This would require the plaintiff to show that none of the costs being claimed as damages would have been incurred if there had been no breach. The opinion of the court is written in terms of the plaintiff's burden to prove causation of damages.

G.C.S. cites the following events causing delay for which it is not chargeable.

1. A one month delay in commencement of construction due to site preparation for the Hydrotreater and the Hydrogen Production Units. Site preparation for these was to have been done by the owner, Pennzoil, but it was not done by April 1, 1970 and Foster Wheeler undertook this work, contracting it out separately to G.C.S. This separate contract was independent of G.C.S.'s contract in issue here, and no allowance for a time enlargement in the foundation and piping subcontract was made here. This work prevented G.C.S. from gaining access to these work areas for approximately one month to perform its foundation work here. However, these two units amount to about 40% of the total work. (Hydrotreater 32%; Hydrogen Production Unit—8%) and did not prevent G.C.S. from proceeding with work at the other units, which the evidence shows it was prepared to do on April 1, 1970, the starting date of its contract. In any event, Foster Wheeler admits that it suffered no delay by reason of G.C.S.'s fault in the Hydrogen unit because its above-ground pipework was connected to a much larger piperack in the Hydrotreater unit.

2. G.C.S. also claims that a cause of delay in its own work not attributable to it is the failure of Foster Wheeler to deliver certain construction drawings needed by G.C.S. to other materials. No time loss is allocated to this.

3. G.C.S. asserts that both it and Foster Wheeler were delayed by the steelhaulers strike which began April 4, 1970. G.C.S. was delayed for a few days in delivery of reinforcing bars until it arranged to have this delivered by its own truck. G.C.S. experienced a more serious delay from the strike in delivery of cast iron pipe which it did not receive until mid-June. This held up pipe installation, backfill and paving.

4. G.C.S. also points to the steelhauler's strike as delaying delivery of the overhead structural steel to Foster Wheeler's steel fabricator to the extent that Foster Wheeler was unable to begin the overhead steel construction until mid-September.

5. G.C.S. also claims that Foster Wheeler was unable to start erection of overhead structural steel at the scheduled time because of labor difficulties with the Ironworkers Union. These workers were scheduled to begin their work for Foster Wheeler on August 15, 1970, but walked off the job on August 17, 1970 in a dispute over travel pay. This dispute was settled by September 2, 1970. Time loss to Foster Wheeler on this item amounted to almost three weeks.

6. G.C.S. argues that it was prevented from completing the paving in the Hydro-treater Unit area because during the month of August, Foster Wheeler moved cranes and heavy rigging into the area for the purpose of erecting certain equipment and ordered G.C.S. to place a substantial amount of this paving to be put on "hold". This equipment remained on this site through the month of October.

While G.C.S. alleges substantial completion of its work by September 1, 1970, the Master Construction Reports for September, October and November show G.C.S. work still uncompleted and weekly progress reports show G.C.S. still working at the job in mid-November. This involved much other work than the paving which was in "hold" in the Hydrotreater Unit.

Foster Wheeler replies that the delays attributable to G.C.S. are the only project delays for which there is any evidence after September 1, 1970. G.C.S. was to complete its contract June 30, 1970. Allowing for two months delay due to causes not attributable to G.C.S.'s fault, Foster Wheeler points to the evidence showing that it had planned to begin its pipefitting operations immediately after the completion of the G.C.S. work; that it planned to have its pipefitter force at peak and perform 70% of the piping during the months of September, October, November and December 1970, to meet its scheduled completion date of January 31, 1971.

However, G.C.S. remained on the job site continuing the completion of its contract work until mid-November 1970. Foster Wheeler contends that this delay caused a two month delay in the start of its steel erection and piping operations after September 1, 1970 and the consequent further delay in its completion due to a slow-down in outside construction during the winter months. While the two prior months have been shown to be due to causes other than the fault of G.C.S. it is claimed that at least two months after September 1, 1970 are due solely to the fault of G.C.S. and no other cause.

Evidence of the extent of this delay attributable to G.C.S. showed some intervening causes for which G.C.S. was not responsible, such as delayed steel deliveries. G.C.S. also points to the unreasonableness of the programming of such work into the late fall months. Based on all of the evidence, we believe that it is reasonable to conclude that G.C.S. was responsible for a one month period of delay, wholly unrelated to other causes, between September and November, when G.C.S. left the job site.

The advisory jury found that there was a reasonable basis for allocation between the delay caused by the fault of G.C.S. and that attributable to other causes, and found that the period of delay due to the fault of G.C.S. was one month.

Foster Wheeler's evidence of delay due to the fault of G.C.S. involved evidence of G.C.S.'s failure to plan, schedule and coordinate its work; failure to provide sufficient supervision; failure to supply the necessary manpower to complete its work within the 90 day period. It was testified that the total man hours required by G.C.S. to do the work was consistent with the original budget estimates of Foster Wheeler in planning the work, but in actual prosecution of the job G.C.S. spread these man hours over more than seven months instead of the contracted three months. There is also evidence of the necessity of G.C.S. to remove and replace certain foundations and footings which were improperly poured and placed.

This evidence all goes to support the conclusion that the actions of G.C.S. was a cause of the delay suffered by Foster Wheeler, aside and apart from other causes for which G.C.S. had no responsibility.

The most strenuously argued question is whether these causes can be sufficiently segregated from other causes to reach a reasonable allocation of the delay caused by G.C.S. from that due to other causes.

Foster Wheeler points to the evidence showing that the other causes affecting its delay were no longer in effect by September 1970, and that the sole cause of

its delay from September until November 1970 was G.C.S.'s presence on the job site from a period of two months after the contracted date for completion until a period more than four months after the agreed on completion date. This in turn caused the work of outdoor pipe installation to be delayed into the winter months, when progress was much slower due to inclement weather and the inability to get pipe fitters willing to work outside in the winter months. Foster Wheeler's four month schedule for this work took eight months to complete and this is attributed to the two month front end delay at the beginning of the job caused by G.C.S.'s continued presence. The jury found the evidence credible to support a finding of a one month delay caused by G.C.S.'s actions and we find a reasonable basis in the evidence for this conclusion.

■ Finding the fact of damages certain, we may make a reasonable allowance from all of the evidence as to the costs attributable to one party causing the delay. *Peter Kiewit Sons, Co. v. United States*, 151 F.Supp. 726, 138 Ct.Cl. 668 (1957); *Chalender v. United States*, cit. supra; *Fuller Co. v. United States*, 63 F.Supp. 765, 105 Ct.Cl. 248 (1946).

■ The evidence of damages which Foster Wheeler presented was not computed by a "total loss" theory, as rejected in *Boyajian v. United States*, cit. supra, i. e. the difference between its total costs and the amount it received. Foster Wheeler rather presented its evidence of its actual out-of-pocket costs attributable to the period of delay for such items as field office expenses, tool charges, supervision, management and home office expense. It does not represent direct labor charges for construction work. It presented such fixed costs for two separate four month periods of the delay and arrived at a four month's average. This translated into $159,371 per month, and the jury determined that the period of delay assignable solely to the fault and breach of G.C.S. was one month. While no witness testified that G.C.S. imposed a one month delay on Foster Wheeler at a specific cost, the Foster Wheeler testimony established the fact of delay, the fault of G.C.S., the cause of delay attributable solely to G.C.S. apart from other factors, and the cost to Foster Wheeler of the delay for a designated period of time. Our only question is whether the evidence is sufficient to allow the fact finder to determine if a reasonable basis for the allocation exists. *Lichter v. Mellon-Stuart*, cit. supra. We find that it was sufficiently proven.

The verdict of the jury on the Foster Wheeler claim is purely advisory. The jury heard the entire evidence in both cases and submitted answers to special interrogatories in the claim of *Foster Wheeler v. G.C.S.* (Civil Action No. 4–72 Erie). There was sufficient evidence to support their finding, and in accordance with the findings and conclusions set forth in the foregoing opinion the court finds:

1. That G.C.S. failed to complete its subcontract with Foster Wheeler in the time agreed upon.

2. That Foster Wheeler was delayed in the prosecution of its prime contract by delays in the completion of the G.C.S. contract for which G.C.S. bears sole responsibility.

3. That the evidence provides a reasonable basis for calculation of the amount of the delay suffered by Foster Wheeler due solely to the failure of G.C.S. to complete its work, apart from delays from other causes for which G.C.S. is not responsible.

4. The evidence provides a reasonable basis for calculation of the costs incurred by Foster Wheeler because of the delay caused by G.C.S.

5. The delay of Foster Wheeler in completion of its contract due solely to conditions for which G.C.S. was responsible apart from any causes for which G.C.S. was not responsible is one month.

6. The amount of the damage suffered by Foster Wheeler from delay caused solely by G.C.S. was $159,371.

## PREJUDGMENT INTEREST

■ Foster Wheeler prays for an award or prejudgment interest. Since the elements of this breach of contract suit were complex and disputed until trial, we feel that there is no equitable basis for an award from the date when the damages were incurred. However, the matter was clear and the damages capable of being liquidated at the end of trial, at the time of the advisory jury verdict. Therefore, we will allow interest on the sum of $159,371. from July 25, 1975.

Because the evidence has shown that defendant I.S.C. Inc. agreed to guarantee all contract commitments of its subsidiary G.C.S., Inc., judgment will be entered against both defendants.

## THE G.C.S. MOTION FOR NEW TRIAL

The jury awarded G.C.S. damages on the following elements of its claim:

| | | |
|---|---|---|
| 1. | Travel pay for ironworkers | $ 6,417.00 |
| 2. | Balance due on building contract | None |
| 3. | Retention | 8,417.00 |
| 4. | Account debit from February 24, 1971 invoice | 6,484.42 |
| | TOTAL | $21,318.42 |

The evidence in support of these elements was clear and the matter was submitted for jury determination under the G.C.S. demand for jury trial. There is no present dispute concerning these.

G.C.S. moves for a new trial, however, on the grounds that the court excluded evidence in support of its claim for loss of productivity because of delays and faults of Foster Wheeler. This matter was thoroughly argued prior to trial on the motion of Foster Wheeler for partial summary judgment where the court entered certain rulings governing the trial in its Memorandum Opinion of May 19, 1975, on the grounds that G.C.S. could make no showing that any delay in completion of its work was due to any item of extra work, change orders, revised drawings and late drawings. We also ruled that there was no evidence to show active interference, arbitrary, capricious, or bad faith action on the part of Foster Wheeler to interfere with G.C.S. performance. G.C.S. voluntarily accepted extra work, it was contractually bound to accept and perform change orders, all change orders and revised drawings were subject to provision for extra compensation and time extensions, and no time extensions were ever requested, and the entire contract was governed by a "no damages for delay" clause.

The proposed expert testimony of G.C.S.'s expert witness, Mr. Posner, was subject to this ruling. The court did not refuse permission to have Mr. Posner called. He was present at trial and G.C.S. did not call him, or other defense witnesses to testify on any of the central issues of the cause of delay. Mr. Posner's proposed testimony was in support of a loss of productivity theory arising out of the delays. G.C.S. admitted that it could not offer evidence of the specific time or money loss caused by any particular act of Foster Wheeler, but attempted to rely on a cumulative effect theory. G.C.S. was unable to segregate delays attributable to Foster Wheeler, from those delays of its own causing, or delays to which it was subject by the provisions of the contract. We have thoroughly covered those considerations in our prior opinion. The same rules govern the exclusion of such testimony as are here argued against the sufficiency of the Foster Wheeler evidence of the cause and effect of delay, but we believe that Foster Wheeler had adequately segregated and apportioned the damages caused by G.C.S.'s delay for which it is responsible, while G.C.S. cannot do this and must rely on a loss of productivity theory which has no support in law.

Finally G.C.S. objects to our ruling on objection to testimony regarding an oral modification of the contract. Our view of this matter is that we did not bar such testimony but required that G.C.S. produce evidence to sustain a prima facie case of oral modification before we would allow questions to be put to a Foster Wheeler witness on this topic on cross-examination, outside the scope of his direct testimony. This testimony could have been elicited

from the G.C.S. witness, Mr. Gray, who testified on other matters, because he was alleged to be present at the event.

The G.C.S. motion for new trial will be denied, and judgment will be entered for G.C.S. on the verdict on its claim.