**E. C. ERNST, INC., Plaintiff,**

v.

**KOPPERS COMPANY, INC., Defendant.**

Civ. A. No. 77–1045.

United States District Court,
W. D. Pennsylvania.

Aug. 13, 1979.

730

Friedman & Gass, P. C., New York City, Baskin & Sears, Pittsburgh, Pa., for plaintiff.

Rose, Schmidt, Dixon, Hasley & Whyte, Pittsburgh, Pa., for defendant.

OPINION

SNYDER, District Judge.

This contract action between E. C. Ernst, Inc. (hereinafter "Ernst"), an electrical subcontractor, and Koppers Company, Inc. (hereinafter "Koppers"), the general contractor, arises out of a sophisticated multimillion dollar construction project (hereinafter "the Project") at the Aliquippa Works of the Jones & Laughlin Steel Corporation (hereinafter "J&L"). The matter was heard non-jury and requires interpretation and application of the Purchase Order (hereinafter "P.O.") awarded by Koppers to Ernst for the electrical work at the J&L coke oven battery A–5 being constructed to provide a unique method for preheating and delivering coal to furnaces for the production of steel. Many difficulties were encountered, ranging from the necessity of not interfering with J&L's plant operations, to the removal of price controls which delayed procurement of supplies, and involving numerous change orders during the entire construction period. At the same time, consideration had to be given by Koppers to the successes and failures being experienced at a "model" project being built almost simultaneously at Inland Steel, and being incorporated at Aliquippa.

As might be expected, each party blames the other for delays, for engineering failures, for lack of participation in necessary scheduling and coordination, and for inadequate personnel and supervision, particularly in light of the importance of prompt completion of the work. Ernst, having been paid the major portion of its contract, now claims $2,325,705 in Count I of its Complaint for additional expenses by reason of the voluminous changes in the scope of the work; $1,484,000 in Count II for extra labor resulting from the many drawing revisions; $9,581.64 in Count III for certain additional work performed at Kop-

pers' direction; plus $60,430 admittedly retained by Koppers. Koppers counterclaims for $1,730,886 for support personnel it provided to complete the job on time, premium time paid to Ernst to prevent delays in the completion date (which it claims were due to Ernst's inefficiency), premium time paid for early check-out which had been delayed by Ernst, and an inefficiency charge for its employees who worked premium time.

## I. FINDINGS OF FACT

### COUNT I

1. Ernst is a District of Columbia corporation with its principal place of business located in Washington, D.C., and is qualified to do business in Pennsylvania. Ernst is engaged in industrial and commercial electrical construction work throughout the United States, with branch offices here involved in Pittsburgh and Ambridge, Pennsylvania.

2. Koppers is a Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania, and is engaged, *inter alia,* in the business of concept and design engineering, and in general contracting services for heavy industrial organizations, such as the basic steel industry.

3. The amount in controversy here exceeds sums in excess of $10,000, exclusive of interest and costs.

4. In June of 1973, Koppers entered into an agreement with J&L to design, engineer, and construct on a "turn-key" basis an A–5 coke oven battery and related facilities at Aliquippa, Pennsylvania, to produce coke for use in the steel making process at a cost of $46,587,650, to be functional by June 17, 1975.

5. At the time of the J&L–Koppers Agreement, Koppers was constructing a coke oven battery of similar concept for Inland Steel in Indiana, and Koppers' specifications for the Project developed in April and May of 1973 were based on Koppers' own expertise, J&L input, the know-how developed from handling problems as they arose at the Inland site, and from experience gained from an experimental plant operating at Ironton, Ohio. The Inland design, and thus the J&L design, was unique in its method of preheating coal and charging the furnaces. It was Koppers' intention to utilize the Inland engineering as much as possible, and, indeed, much of the process engineering at the Project was taken from Inland. The J&L–Koppers Agreement, dated June 12, 1973, stated that Koppers would duplicate the work done by it at the Inland site. However, all parties contemplated changes for adaptation to the Project.

6. The coke battery at the Project differed from the conventional facilities by incorporating novel techniques. The ovens are similar to conventional facilities. The principal differences are the method of charging the ovens with coal and the preheating of the coal prior to charging. The process involved a structure known as a preheat facility. Crushed coal is taken from barges, on a conveyor and fed into coal storage bins located in the preheat structure. From there it is processed through a pulverizer which reduces the coal to dust size particles. The pulverized coal is then heated by blowing heated air through it to raise the temperature to approximately 500° F. The preheated coal is then fed into charging bins. In conjunction with the heating process, recovery techniques and equipment are used to remove coal dust from the heated air which is then recycled. This coal dust is added to the charging bins. The bins are then pressurized using steam, and the preheated coal is blown by steam through a pipe known as the charging pipe into the ovens. No leveling is required because of the fluid nature of the preheated coal. The remainder of the coking process is similar to the conventional method, with the exception that an advantage is realized from the preheated coal in that coking time is reduced.

7. Inland became operational in August of 1974, but changes continued to be made through August of 1975 in order to overcome experienced difficulties, all of which, to some extent, were reflected in changes at the Project.

8. The Project was not completed on the scheduled date of June 17, 1975, and the charge date of the battery occurred on January 1, 1976.

9. After entering into the Agreement with J&L, Koppers immediately undertook the initial steps for demolition of existing facilities and relocation of utility lines. Concurrently, Koppers' engineers commenced the design and engineering for the Project, while its Procurement Department began ordering equipment and materials as they were identified by the Engineering Department. This technique is known in the construction industry as the "fast track" method, its purpose being to reduce the time between conception and operation. Both Ernst and Koppers were familiar with, and had previously used, the fast track method.

10. Koppers' Engineering Department developed plans and specifications for the work to be subcontracted, including the installation of the electrical materials. On January 11, 1974, an electrical bid package containing specifications, drawings, equipment lists, arrangement and single line drawings, flow diagrams, instructions to bidders, and other materials was issued to prospective bidders.

11. Koppers separated the electrical work into various work areas, such as wet coal handling, preheat, and the like. When the initial package was issued, drawings and other information were not yet available for all work areas, and the bidders were asked to submit quotes on each of the areas as completed.

A. *The Purchase Order*

12. On April 25, 1974, Ernst made a bid on the electrical work of $3,356,800. The resultant subcontract was based on a Purchase Order issued by Koppers to Ernst on June 4, 1974, Purchase Order No. 2463–2–002.

13. A variety of reasons, which will be described later in greater detail, contributed to an increase in the cost of the Project and an extension of Ernst's performance date beyond the targeted charge date of June 17, 1975. Essentially, it was changes dictated by the experience at the Inland site, requests from J&L, and coordination and engineering failures on Koppers' part that eventually increased the estimated man hours by more than 100%.

14. The price of materials and fabrication rose dramatically during the construction period, when nationally fixed price controls were lifted, increasing the final costs.

15. As a result of the lifting of price controls, delays were encountered in obtaining materials, primarily structural steel, and many suppliers and fabricators were unable or unwilling to meet delivery dates and prices which had been agreed upon earlier. We find, however, that the lifting of Federal price controls did not create an unforeseeable major difficulty which would excuse Koppers' late performance in the procurement of machinery and equipment.

B. *Trade Interferences*

16. In order to qualify for an investment tax credit, J&L demanded that the facility be operative by January 1, 1976. To meet this deadline, Koppers and its subcontractors were required to complete a project which had been expanded 70% in scope, in a time framework expanded only 27%; a "crash program" was created to complete the job.

17. The Engineering Department of Koppers was 15.7 weeks late in developing final drawings, causing further time constraints.

18. As a result of the crash program, 654,000 hours of direct labor were added by the Koppers' forces, originally projected at 928,000 (including 110,000 man hours anticipated for electrical work); this work was performed by over 450 men of various trades. More than two-thirds of this was committed in the last six months of the Project; half of Ernst's work was performed in the last six months.

19. This crash program resulted in delays to Ernst caused by trade interferences, both from other trades, the so-called "stack-

ing of trades", and from being forced to work in a "stop and go" fashion on work beyond the scope of the P.O.

C. *The Critical Path Method*

20. The initial bid package included a current computer printout of the electrical activities, so that the electrical contract bidders could plan their volume, distribution, and peaks. This is known as the Critical Path Method (hereinafter "CPM"); it divides a project into separate work activities which, when shown in diagram form ("networks"), direct the sequence of job progression and reflect the interrelationship and dependency among the activities. This arrangement is referred to as the "network logic". Each activity is assigned a duration, from which expected and required starting and completion dates are calculated for each activity in relationship to all activity durations and network logics, in order to meet the charge date. As the work progresses, the CPM is updated and revised through computer adjustment, normally on a monthly basis.

21. Koppers developed the CPM schedule for the Project to coordinate the engineering, procurement, construction and final checkout phases. There were more than 100 CPM network logic diagrams on the Project, containing approximately 10,000 activities, some 340 of which were electrical.

22. As has been noted, the target date for charging the Project's battery ovens was initially June 17, 1975, and the CPM was adjusted forward and backward from that date, "the forward and backward pass".

23. As part of the electrical bid package, as noted above, Ernst received the then current CPM drawings and computer printouts listing the electrical activities; on May 30, 1974, the CPM showed the Project to be approximately six weeks behind schedule.

24. In August of 1974, Ernst submitted man power schedules which included the estimated man power requirements based on Ernst's analysis of the current CPM schedule.

25. The P.O. provided as to the CPM: "Seller agrees to follow the plan as currently shown and to perform the work in the allotted time designated as activity duration. Seller agrees to suggest revisions to the network plan that in his judgment would be mutually beneficial; time being of the essence."

26. The original CPM schedules provided for major construction activity to commence in the early fall of 1974, and Ernst, being a "follow on" contractor who must of necessity follow other contractors, was dependent upon the availability of work areas. On August 22, 1974, Koppers' CPM analysis showed that of 339 "total activities" for the electrical contractor, 332 were not available. As of October 17, 1974, 329 activities could not start, on November 14, 1974, 317 could not start, and by January 9, 1975, 282 activities could not be started, far less than the original CPM schedule contemplated.

27. The P.O. required that a qualified person be assigned by Ernst to work with the CPM because special training and knowledge are required to properly maintain and utilize the CPM as a planning and scheduling tool.

28. Ernst did not fully participate in the CPM, particularly toward the end when it became apparent that Koppers was no longer using the CPM as a control method. But, in any event, Koppers had resident engineers whose direct function was updating the CPM, and Ernst's failure to do so had no effect in causing delays in the performance of its contract. Koppers' engineers were at all times familiar with the exact progress of the electrical subcontract and were, in fact, updating that progress on the networks.

29. After September 18, 1975, the CPM was replaced, as requested by J&L, with a more detailed construction and operating check-out schedule in bar chart form. Ernst was provided with copies of these bar charts, to which no input from Ernst was required.

30. We find no evidence on the record that Ernst failed to perform adequate forward planning and scheduling with regard

to work availability in sequence, material procurement, and man power requirements.

D. *The Seasonal and Premium Time Claim*

31. Ernst was required to work well into the winter of 1975 because of the massive changes in the scope of the work not contemplated by the P.O.; this second winter was not anticipated.

32. As a result of changes in the scope of the work beyond the P.O., and because of the overriding desire of Koppers and J&L to complete the Project, Ernst was required to put in premium time work.

E. *The Supervision Problem*

33. Ernst's top field supervisor on the Project was Howard Miller, who was also in charge of Ernst's work for other contractors in other areas at the Aliquippa Works.

34. While Howard Miller was absent from the Project job site during the summer of 1975, due to the terminal illness of his wife, there is no proof that Miller's absence caused inefficiency or failure to perform by Ernst.

35. As soon as Koppers complained about the situation (Miller's absence), Ernst's Ambridge Branch Manager, Wallace McCracken, was sent to supervise the Project, and he immediately brought about substantial gains in the use of personnel. No provable delay to the Project resulted from lack of supervision by Ernst.

F. *Supporting Personnel*

36. Under the supplemental instructions to bidders, Koppers indicated they would not supply any supporting personnel (electrical engineers, materials supervisors, construction or electrical superintendents, etc.) "to the field installation". It was the bidder's responsibility to provide whatever type of personnel *required to complete the contract.* Koppers did furnish supporting personnel who primarily interpreted Koppers' engineering drawings and the many change orders issued in light of the Inland experiences. It is the wages paid to these persons which forms the basis of Koppers' counterclaim against Ernst, and is part of their defense as to Ernst's performance.

37. Throughout, Ernst manned the Project with sufficient personnel, although the Project was greatly accelerated in order to meet the January 1, 1976 final deadline.

38. The wages paid to these men have nothing to do with the construction of the electrical facilities, but, to the contrary, were required through no fault of Ernst's failure to perform.

G. *Ernst Delays and Failure to Complain*

39. The CPM analysis letters showed electrical activities prominently on the top critical path, and the general comments to those letters indicated that Ernst had undermanned the job; we find, however, that this matter was taken up at job conferences and Ernst, in fact, procured additional manpower without delay to remedy the situation.

40. Koppers' CPM expert, David Lee, contended that Ernst failed to perform activities as they became available. We find, however, that Lee failed to review a history of the constraints on a particular activity, and that this was a necessary part of a CPM review. We find that Ernst performed the work as expected by the CPM schedules. We further find that the causes of delay were late engineering, extended durations, additions in design, and procurement problems.

41. Koppers contends that Ernst caused its own delays for a variety of other reasons: that they were working on another unrelated job for J&L at the Project site; in some instances the electrical work was incorrect; that they obstructed the single access road at one point; that they delayed in procuring certain equipment which they were responsible for ordering. However, we find the Defendant has not proved with any certainty that the effect of these actually delayed the project; the Plaintiff has proved the contrary.

42. Koppers emphasizes that the minutes of meetings do not show complaints by Ernst as to the problems of delay and interference to Ernst by other trades. We find that the problems were discussed and worked out.

43. In the minutes of the meeting of August 22, 1974, the following appears: "For efficiency, E. C. Ernst will work in areas that are open and materials on hand." This was a recognition of the problem of delays and inefficiencies.

44. In the minutes of the meeting of January 16, 1975, the following appears: "The purpose of the meeting was to review any outstanding problem that was preventing E. C. Ernst from completing his work as scheduled." Ernst stated it was "concerned of material shortages (example—insulators)", and needed Koppers' engineers "to assist Ernst in the exact location of instruments and controls which are not located on Koppers drawings, Ernst was unable to keep the work area warm." Problems were thus being raised by Ernst.

45. The effectiveness of the job site meetings is shown by a letter of T. B. Myers of Koppers to James K. Shannon of Ernst, which stated: "We intend to continue to expedite this project . . . and the details of the common coordination problems should be worked out in the scheduled field meetings."

46. In the minutes of the meeting of January 30, 1975, this appears: "Mr. Adams [of Koppers] stated that Koppers was not getting the Quench Track as originally promised and the delays in obtaining same daily was seriously interfering with progress." Also, "E. C. Ernst stated they were concerned about steam from the Quench Cars forming ice on the Shed Steel causing hazardous working conditions." Also, E. C. Ernst demanded the check-out list as soon as possible to make certain they were "installing equipment, etc. in the sequence required". E. C. Ernst "stated they were encountering many delays due to both structural and mechanical interferences."

### H. *The 30 Day Clause*

47. The P.O. contains a provision that claims for extra work, where such work was not the result of "deviations" between J&L and Koppers, would be submitted to Koppers within 30 days of Ernst's receipt of the request for extra work.

48. Shannon wrote Koppers' Beale on May 30, 1975 and asked Koppers to waive the clause. Beale did not respond to that letter. Beale's testimony was contradictory as to whether he spoke with Shannon about the May request. On July 2, 1975, Shannon again wrote to Beale stating that since there had been no response to his first letter, Ernst assumed that Koppers deemed the clause waived. Again, there was no written response, although Beale circulated the letter among several of Koppers' Departments.

49. Koppers' Moran claims to have told Shannon, prior to the May 30th letter, that the clause would not be waived. No memorandum was made of this alleged conversation, despite the practice of both Moran and Beale to record even the most trivial of telephone conversations. Beale, who testified of being told of the alleged conversation, did nothing to remind Shannon of it upon receipt of Shannon's letters.

50. When Beale received the drawing revision claim, he promptly advised Moran, who told him to circulate it and the supporting price sheets to the various Koppers' Departments. Neither man told Ernst that the clause precluded consideration of the claim. If Jones, Moran and Beale—and Koppers—considered the clause a bar to any part of the claim, such views were not communicated to Ernst.

51. The Ernst claim was the subject of extensive negotiations between Ernst and Koppers. At no time after the presentation of the claim, during the negotiations or prior to this suit, did Koppers assert that the claim or any portion of it could not be advanced by reason of the so-called "30 day clause". Koppers did not even discuss the clause internally after July of 1975.

52. We find that the conduct of Koppers in failing to insist on the 30 day notice provision in light of their "approved for construction" orders to proceed and their failure to reply to Shannon's letters, prevents Koppers from now using this clause as a bar to Ernst's actions.

I. *Damages*

53. Koppers alleges that they inquired whether the $1,484,000 claim for drawing revisions constituted Ernst's entire claim on the Project, and Ernst did not indicate that it had any other claims. Koppers avers it was completely surprised by the additional claims which were made. We find that Koppers was not surprised by the claims because Koppers' personnel stated they realized the extent of the many claims Ernst could make. We find that Ernst is not estopped from asserting these additional claims.

54. In its Count I damage calculations, Ernst has employed what is known as the "total cost" method. Aside from the fact that the $2,325,705 claimed seems to have nothing to do with Ernst's "total cost," we find the approach itself is invalid. Ernst fails to prove specific amounts of delay and damages allegedly attributable to specific acts or failures by Koppers.

55. The figure of 82,980 hours, which Ernst uses as its original estimate of hours to complete the work, has no basis in fact. The figure is an average, calculated in 1977 by Ernst's claims expert, R. P. Anthony, of three different man power estimates prepared by Ernst in or about August of 1974.

56. Ernst's hypothetical allocation of unpaid journeyman hours, on the basis of the number of drawing revisions received per year, is invalid. Not all drawing revisions required work by Ernst, and not all revisions caused an equal amount of work. This artificial method of allocation is not a proper substitute for specific proof.

57. Ernst's calculation of its Count I damage is based, as noted above, on the total cost approach. This calculation includes approximately 10,000 hours expended by Ernst on the temporary light and power contract, which was not part of the P.O., not in suit here, and paid in full under the temporary contract.

58. This finding makes the Ernst calculation of the Count I claim invalid as there is no method of calculating any figure for the remaining Count I claim.

59. While premium time inefficiency is recoverable, Ernst has failed to prove any amount of damages attributable to such inefficiency.

60. While labor escalation is recoverable, Ernst has failed to prove any amount of damages attributable to escalation of cost.

COUNT II

A. *Drawing Revisions*

61. In 1973, when the Koppers bid was accepted by J&L, both parties contemplated duplicating, with very little re-engineering, the coke battery of unique design being constructed by Koppers for Inland Steel Company. Even the CPM method of scheduling for the J&L Project was based upon scheduling done for the Inland job. The 23½ month estimate was agreed to because Koppers thought much of the Inland engineering could be followed, and the Agreement between J&L and Koppers stated that Koppers' work would duplicate that being done at Inland; when bids were received from electrical subcontractors, they were reviewed by Koppers in light of its Inland experience.

62. When the Inland plant attempted to "push coke" in August 1974 (several months after the effective date of the subcontract between Ernst and Koppers for the J&L coke oven), serious and extensive problems were experienced: motors burned out, dust conditions caused explosions and fires, and mechanical difficulties plagued the plant's operations. In addition, there was a time overrun of nearly one year on the Inland job. Because of the Inland problems, Koppers formed a committee to analyze the difficulties, and the work of this committee resulted in engineering revisions at the J&L Project, which continued throughout the performance of Ernst's work, almost until the completion of the Project in January 1976.

63. In addition to changes demanded by J&L, the ongoing changes at Inland resulted in numerous drawing revisions throughout the Project. Ernst received 289 draw-

ings in its original bid package and received over 1300 additional drawings by way of revisions, 20% arriving after the originally scheduled completion date for Ernst's work. Many drawings were revisions of revisions, and some were revised as many as seven times. These revisions were exceptional and excessive in number; the extra work performed pursuant to them has not been paid for.

64. The drawing revisions affected Ernst's ability to perform its work in a normal and efficient manner, and some of the revisions were issued by Koppers after Ernst had completed the work shown, requiring Ernst to rip out and replace work already done. This had a detrimental effect on other work in progress on the Project.

65. While the drawings as issued were not and were never intended to be complete, it is clear that the additions and revisions contemplated by the parties did not include the massive changes brought about in the scope of the work by Koppers.

66. The instructions to bidders stated that the drawings would be issued for construction as engineering progressed and could be revised. But the revisions made here are found not to have been within the original scope of the work, and thus not covered by the instructions to bidders.

67. No request for quotation was made to Ernst for the revisions, nor was any written authorization given to proceed with specific work; rather, plans were marked "approved for construction".

68. Because of the frequency of drawing revisions, the time involved in comparing bid drawings with revisions and in pricing extra materials that such revisions might require, and the paramount desire of Koppers and J&L, communicated daily to Ernst, to complete the Project, Ernst generally proceeded with the work required rather than making drawing price proposals to Koppers. We find Koppers acquiesced in this procedure knowing that revision claims would be made.

69. James Johns, Claims Manager for Ernst, examined the drawings as they came in; after construction began most revised drawings were stamped "approved for construction". These were distinguishable from bid drawings, which were stamped "for bidding purposes". Late in May, 1975, Johns and four other Ernst estimators began comparing the latest drawing revisions with the original bid drawings, and lists were made showing the materials which had been added to or deleted from the bid drawings. Where there was no comparable bid drawing with which to make comparison, lists were compiled showing the new materials required.

70. These lists or pricing sheets were turned over to a single Ernst estimator, Shadler, who reviewed the sheets to eliminate duplications, and then priced the materials using either recent invoices Ernst had paid for such materials or the catalogues of trade suppliers. Credit was given to Koppers by Ernst for materials deleted at the same price as similar materials were added, except in the case of wire and cable where nominal or no credit was given for deletions, since such material could not be returned by Ernst to the supplier. A similar credit policy was used for other equipment which had been purchased by Ernst and which could neither be returned nor readily used elsewhere. We find this accounting procedure to have been proper under all the circumstances. If material was supplied by Koppers, no price was noted by Ernst on its pricing sheets either as a charge or credit, and the prices charged by Ernst for materials it provided were the fair market prices then in effect for such material.

71. Shadler then computed the hours of journeyman electrician labor necessary to install such material based on Ernst's experience and the estimator's judgment of the Project conditions and difficulties (such as the height and location of the work site).

72. The hours of additional labor were priced by using the journeyman electrician rate then charged by Ernst, $20.77 per hour, and adding thereto a $5.60 factor representing the cost to Ernst, not otherwise re-

flected in the journeyman labor rate, of comparing revisions with the bid prices and pricing the additions and deletions. There were 36,049 journeyman hours devoted to additional work pursuant to the drawing revisions. Conversely, the hours for labor associated with deleted work were credited to Koppers at $15.80 per hour, the journeyman rate less Ernst's overhead and profit.

73. The Ernst pricing sheets involved some 144 drawings and were submitted to Koppers, along with a claim for $1,544,307, on December 9, 1975. An adjustment was made on December 12, 1975, correcting additions and deletions, for a total of $1,515,-222, which was again adjusted the same date to deduct a field authorization in the amount of $20,369, leaving the total net increase as claimed for drawing revisions at $1,494,853. This was further adjusted to $1,484,000. We find all of these items to be properly chargeable as "extras".

74. Following the December 1975 letters, and at Koppers' request, Ernst delivered its pricing sheets in support of its $1.4 million bill for work on revised drawings. These pricing sheets were duplicated by Koppers and disbursed among the various departments responsible for the A–5 job, with the request that each department comment upon the details.

75. The Engineering Department made several analyses of the Ernst claim and accepted many parts of the claim entirely. The appraisal by the head of Koppers' Engineering Department, Kunkel, was characterized by Robert Moran as solid and competent, although Moran noted one Koppers engineer, Huitema, vacillated concerning his "No" position.

76. The Estimating Department assigned the task to Vaneski, whose first review yielded $825,570 in Ernst's favor. This review took a year and a half and did not begin to change significantly until the spring of 1978 when the review became "step 1", "step 2" being a reduced version prepared with the assistance of counsel. As part of his initial review, Vaneski credited Ernst with 75% of the value of certain work for which he could find no Ernst pricing sheets. The important point with respect to the various Koppers' analyses, and we so find, is that the method of pricing used by Shadler was found not objectionable.

77. Negotiations proceeded in 1976, but Ernst ceased participating when it appeared Koppers would not honor a substantial portion of the claim.

78. Koppers valued the claim internally at $500,000; this is the amount they submitted to J&L as the Ernst claim. None of the money from the J&L settlement has been given to Ernst, nor any of the $60,430 retained by Koppers.

79. The Plaintiff's calculation of revision claims failed to deduct $500 as required by Paragraph 6 of the P.O., which states:

> "A drawing revision that constitutes an addition or deletion due to changes in motors which cause an increase or decrease in conduit and wire size, addition or deletion of lighting, addition of drives, starters, etc. not shown in the Bid drawings or not contained in the intent of specifications furnished. A claim for the above will be reviewed on the strict basis that the initial cost (Labor and/or materials) of 500.00 is to the account of the seller."

80. Applying the $500 provision to each of the claims made by Ernst in the December 12, 1975 claim results in a total deductible amount of $62,080.[1]

81. Recovery in this lawsuit by Ernst of more than the approximately $1.2 million loss certified by its accountants would not constitute a windfall for Ernst. Mr. Soreff, Ernst's former accountant, testified that

1. This figure is derived by deducting $500 for each revision over $500 and excepting the face amount of each claim under $500. In the case where drawings were aggregated for a lump sum claim, $500 was deducted for each revision, except drawing 6A214 (which was not a revision); for drawings 6A221–223 the face amount of $1178 was deducted. The $500 deductible provision was not applied to the following two claims which did not constitute drawing revisions: "conduit & wire on pusher machines" and "conduit & wire on door machines".

Ernst carried $1,894,933.50 on its books as a receivable, which represented Ernst's actual loss on the A–5 Project plus a $600,000 (approximately 33⅓%) profit.

82. Whatever the accounting practices of Ernst may have been, it goes only to the weight to be given Ernst's claims for inefficiencies. The figure of $1,894,933.50 was in fact reduced to $1,294,933 by the elimination of the $600,000 profit figure, to represent the cost receivable.

83. There is no basis in Ernst's accounting practices for refusing to allow the Count II claim in full.

84. Thus, we find the Plaintiff on Count Two to be entitled to $1,421,920 ($1,484,000 less $62,080 under the $500 deductible), with interest from December 12, 1975–$1,732,794.60.

### COUNT III

85. During the course of the Project, Ernst performed work pursuant to field authorizations and directives issued by Koppers. Field authorizations were issued to accomplish work not shown, or to correct work shown on construction drawings which involved field interferences. Ernst performed the work and thereafter calculated the journeyman hours and materials required to perform such work. The calculation was set forth and priced on an Ernst "work order" form which was submitted to Koppers as a bill. The labor was priced at the journeyman rate then in effect, and six such orders are the subject of Count Three, for an aggregate of $9,581.64, which amount has not been paid.

86. We find that the work with respect to such orders was performed by Ernst at Koppers' request, and the price fixed by Ernst for such work was reasonably and correctly computed. Plaintiff is entitled to recover for these work orders in the amount of $9,581.64, with interest from October 15, 1975–$11,775.66.

### THE COUNTERCLAIM

87. Koppers had a large field force to assist in the Project, and the services of these forces were considered part of the original J&L contract. They were later billed to J&L under deviations which followed J&L authorizations or extra work orders, and, in some instances, they were attempted to be billed or back charged to Ernst. These form the basis of the Defendant's counterclaim and there is no contractual basis for charging these amounts to Ernst. We find there is no proof for this aspect or the other aspects of the counterclaim.

### SUMMARY

88. We find the contract retention of $60,430 by Koppers to have been unjustified and award this sum to Ernst, together with interest thereon at 6% per annum from December 12, 1975 (the date of demand for payment)—$73,691.48.

89. We award to Ernst on its Count II claim, the sum of $1,421,920, with interest at 6% per annum from December 12, 1975—$1,732,794.60.

90. We award to Ernst on its Count III claim, the sum of $9,581.64, with interest at 6% per annum from October 15, 1975—$11,775.66.

91. All other claims made by Ernst are denied, as well as the counterclaims of Koppers.

## II. DISCUSSION

### A. COUNT I

#### 1. *The Delays and Their Impact*

Count I of the Complaint seeks damages arising from delays imposed upon Ernst during the course of its work as electrical subcontractor to Koppers on the construction of an A–5 coke oven battery and related facilities for J&L.

The record in this case is replete with evidence of Koppers' numerous changes in the drawings, to the point where a demand was made for a cut-off date so that the Project could finally be completed. Many interferences resulted to the work of subcontractors, both from revisions and changes in the scope of the work. Koppers

had substantial difficulties in procurement of supplies and equipment which caused costly delay to Ernst.

As a general proposition, the law imposes liability upon a general contractor for additional costs for delays caused by him. Thus, in *Johnson v. Fenestra, Incorporated (Erection Division)*, 305 F.2d 179, 181 (3rd Cir. 1962), it is stated:

"Because the contract was to be performed in Pennsylvania and had most of its other contacts with that state, Pennsylvania contract law determines whether the prime contractor's conduct in connection with the agreed supplying of materials constituted a compensable breach.

It is a familiar rule of contract law, adopted and applied by the courts of Pennsylvania, that a party breaches a bilateral contract when he does improperly or fails to do something which he has expressly or impliedly undertaken to do to facilitate the performance of the other party. *Just Mfg. Co. v. Falck*, 1946, 354 Pa. 421, 47 A.2d 659; *Bodman v. Nathaniel Fisher & Co.*, 1920, 268 Pa. 535, 112 A. 99; *see Sheehan v. Pittsburgh*, 1905, 213 Pa. 133, 62 A. 642. Actually, this rule is but an application of the more general principle that a contract is to be enforced so as to give effect to the reasonable expectations created by the parties in entering into the bargain. *See In re Kellett Aircraft Corp.*, 3d Cir. 1951, 191 F.2d 231; *Restatement of Contracts* § 315; 5 Williston, *Contracts*, rev. ed. 1937, § 1293A.

Within this framework, the question here is whether the furnishing of defective panels and the ensuing delay in supplying serviceable panels constituted a breach of contractual obligation. The contract expressly required the prime contractor to supply the panels which the subcontractor had agreed to install. The contract also required that performance begin within 7 days after its execution. On July 14th, promptly after the arrival of the panels which later proved defective, the subcontractor put an adequate crew to work upon the installation. In addition, the court below expressly found that in the contract negotiation 'the understanding was that the installation had to be completed before cold weather, so that * * * workers could pursue other construction tasks inside with the benefit of heat'. However, the court regarded this understanding as unimportant because the enclosure of the structure was something upon which the prime contractor insisted in the interest of its remaining work. But regardless of the reason for reaching an agreement on this point, we think the conclusion is inescapable that the bargain as made necessarily implied and gave the subcontractor assurance that the prime contractor would perform his obligation to supply panels at times and in quantities consistent with the understanding of the parties as to the prompt beginning and early completion of this installation. To rule otherwise would be to defeat the reasonable expectations created by the conduct of the parties."

But we cannot stop here, for the *Johnson* court went on to say:

"Fenestra urges that *Carroll Elec. Co. v. Irwin & Leighton*, 1923, 80 Pa.Super. 428, supports its claim that damages caused by such delay as we have here is not compensable. But in the *Carroll* case the Superior Court relied upon the fact that the contract included an express provision for extension of time on account of delays experienced by the subcontractor by reason of conduct of the contractor or any other subcontractor. The contract also stipulated that it contained the entire agreement of the parties. The court reasoned that in such an integrated contract the express provision for a particular remedy in the event of the delay must be construed as affording the sole remedy for such an occurrence. Of course, parties may validly contract that an extension of time shall be the only remedy for circumstances or contract causing delay. *Henry Shenk Co. v. Erie County*, 1935, 319 Pa. 100, 178 A. 662. The bargain in the *Carroll* case was construed as being such a contract.

It is equally clear that Fenestra is not aided by cases that treat delay as compensable because the occurrences which caused the delay were themselves within the contemplation of the parties at the time they entered their contract. *Acchione v. Commonwealth*, 1943, 347 Pa. 562, 32 A.2d 764; *Frederick Snare Corp. v. Philadelphia*, 1937, 325 Pa. 460, 190 A. 889.

None of these cases are in derogation of the general rule stated in the *Shenk* case that 'where the execution of * * [a construction] contract is dependent upon something essential, which has to be performed by the * * * [other party], the default of * * * [that party] for an unreasonable time, resulting in damages to the contractor, may render the * * * [other party] liable for such damages'. 319 Pa. at 105, 178 A. at 664. This rule applies here." *Id.* at 182.

*See Precision Steel Decking & Erection Co. v. American Steel Building Co.*, 347 F.Supp. 431 (E.D.Pa.1972), *remanded* 487 F.2d 1395 (3rd Cir. 1973).

Since Koppers was responsible for numerous delays, it is patently unreasonable to deny payment for the impact of such delays unless *Carroll Electric Co. v. Irwin & Leighton, supra,* applies. The rules were applied in *Lichter v. Mellon-Stuart Co.*, 305 F.2d 216, 218 (3rd Cir. 1962), as follows:

"Certainly a contract may validly provide that a contractor shall be entitled to no relief except an extension of the time of performance if circumstances beyond his control shall delay his performance, even though such delay does in fact increase his costs. We have today so ruled in *Johnson v. Fenestra, Inc.*, 3 Cir., 305 F.2d 179, relying upon *Henry Shenk Co. v. Erie County*, 1935, 319 Pa. 100, 178 A. 662. Such a clause might preclude damages here if it were the subcontractor's essential complaint that his performance had been made more costly because he was required to postpone his operations."

However, in *Peter Kiewit Sons' Co. v. Summitt Construction Co.*, 422 F.2d 242 (8th Cir. 1969), the Eighth Circuit explained that *Lichter* was limited to those situations where there was no change in the scope of the work and refused to apply a no damage provision where there was a substantial change in the scope of the contract.

We must now look to the conduct of the parties and the terms of the Koppers-Ernst subcontract to discern the reasonable expectations of the parties.

2. *Trade Interferences*

The P.O. provided (Special Conditions, ¶ 7):

"It is seller's direct responsibility to work in conjunction with other trades with relation to the installation of his material and equipment to ensure that no conflict arises necessitating removal of any of his work. Any removal or reinstallation required will be for the account of the sub-contractor responsible."

█ The claim of Ernst results, substantially, from inefficiencies caused by "stacking of trades". We find that this concentration of work within a short period produced many inefficiencies, including the necessity of removing some of the electrical work. The provision quoted does not apply to stacking, but relates only to removal costs arising from conflict of work, and we construe this limitation to apply only within the general scope of the work called for by the contract. Since we find the scope of the work to be vastly expanded, and that this expansion within a compressed period was responsible for the removal, the P.O. does not limit Ernst's claim in this respect.

█ Ernst has also claimed that delay was partially caused by "stop and go" work, whereby they were forced to work on an area, leave it unfinished, and return to it later. The instructions to bidders provided:

"Bidder is required to proceed with installation and later come back to same area to make the additions without increase in contract price."

An ordinary stop and go claim would be barred by these instructions, but again, this limitation only applies to the scope of the work contemplated by the contract. It does not bar Ernst's claim for stop and go delays outside the scope of the work.

3. *The PERT/CPM Networks*

The P.O. provided (PERT/CPM Requirement Section):

"Seller acknowledges that Koppers is planning and scheduling this work by the PERT/CPM Method.

Seller is cognizant of this PERT/CPM requirement to provide qualified personnel to maintain correct networks for his portion of the work and to report progress monthly/bi-monthly, by submitting a 'marked-up' copy of the electrical construction network.

Seller agrees to follow the plan as currently shown and to perform the work in the allotted time designated as activity duration. Seller agrees to suggest revisions to the network plan that in his judgment would be mutually beneficial; time being of the essence."

█ Koppers cites Ernst's admission that it failed in large measure to have input to the CPM by reporting monthly, or at any time, or by submitting a "marked-up" copy of the networks. We note that Benjamin Wilkinson, Koppers' resident engineer in charge of scheduling the work of subcontractors and the use of the CPM, credibly testified as follows (Tr. pp. 2330–1):

"Q All right. Now, would you explain, if you would please for the record and for Judge Snyder, what the CPM or C.P.M. PERT system is that was used on the J & L A–5 coke oven battery job?

A Well, the C.P.M. network is a management tool. It is a guide on how to build your job. Basically what you do to make a C.P.M. network is you start off by finding out from the contract specs exactly what is in the contract, what you have to install, with that combination, with the experience from past jobs and you physically sit down and build the job on paper the way you are going to build it out in the field.

Q Does the term activities have any meaning with respect to C.P.M.?

A An activity is a certain piece of work in that network. For example, if you are going to put in a foundation, a group of activities would be first you have to excavate the hole. The second activity would be to install the form work. The third activity would be to install the rebar. These are all work—

Q When you say rebar, what does that mean?

A Reinforcing bar for the concrete. Then you would pour the concrete. Every one of those, we refer to them as activities.

Q Now, you say that you have to put those activities or something like that on paper? How is that done?

A By physically sitting down and putting them in a graphic form with a—with a graphic type system of just a straight line with the title of that activity, whatever it is, excavating the foundation, on the top line, tying that in with another line following it with the next activity."

Mr. Wilkinson further testified (Tr. pp. 2440–1):

"Q You said something about periodic updates of the CPM. Would you state whether the CPM is a static thing or an ongoing thing?

A When we are in the field and we are physically working on the job, the J & L network, we updated every three weeks. What I mean by 'update' is that the network, it is just a guide, it is just a management tool to help us build that job. It is flexible, it can be changed. When I update it, all the activities that I have started to work on I put an actual date on that activity. I put if we complete an activity on such and such a date, I complete that activity. Duration changes, and if it is taking us longer to do a job than I originally anticipated, I extend that duration to show it is going to take a little while longer.

I change the logic sometimes if something pops up to where it is a piece of material a manufacturer originally said was going to take ten weeks and it is now going to take him 20 weeks to fabricate and we get into a negative critical path that is really running bad and I can't get that piece of equipment there any sooner, I then go back and I take a look at my logic.

Maybe I can go ahead and work on the work I said would follow that. I might have to break that tie and put it downstream of the activities a little.

When all that information is put down on the paper, I again send it into our planning and scheduling experts. Engineering and procurement does the same thing with theirs every three weeks, so we get all the current information, they assemble it, run through the computer and we get a new printout.

Q And where does the information come from that goes into the computer?

A It comes from three sections. Construction updates their network to what is happening. The engineering people do the same. The procurement people update theirs to where they are at with ordering machines and equipment and so forth, and all that information is then assembled in the scheduling and planning section of our company, and then they tie it altogether."

We know that the Engineering Department took 36 weeks to develop the final drawings, originally estimated to take 21 weeks (Tr. p. 2536), and was thus 15.7 weeks late from the original planning. We also know that Wilkinson was on the job to make whatever changes were necessary to the computer run-offs. Thus, no delay was in any way caused on the Project by reason of Ernst's non-cooperation with the CPM Program. This is particularly true in light of the substantial engineering field forces (20 to 30) that Koppers maintained (Tr. p. 2579) and a total of over 450 men at the site (covering trades, such as laborers, carpenters, millwrights, boilermakers, and pipefitters). When 70% of the work was compressed within 27% of the construction time (Tr. p. 739), by reason of Koppers' failure properly to plan, coordinate, and procure for the Project, delay damage to Ernst was foreseeable and inevitable.

4. *The Seasonal Claim*

█ Ernst claims extra expense for work required to be done in the *second* winter by delays caused by Koppers. As to this, the P.O. provided (General, ¶ 3):

> "Work performed during a season of the year not originally anticipated, unless specifically mentioned herein, does not constitute a basis for additional charges."

Again, had the work under the contract brought about seasonable extra costs, the P.O. would control. Where, however, the delays, as here, carried over into the second winter through changes in the scope of the work, this provision has no application. The claim by Ernst for inefficiencies caused by the *second* seasonal delay is not controlled by that provision.

5. *The Premium Time Claim*

█ Ernst makes claim for inefficiencies caused by premium time work. The P.O. provided (Seller Agrees to Comply With, ¶ 8):

> "Price is based on an eight (8) hour day, five (5) day week, Monday through Friday, inclusive.
>
> The following will apply to field overtime, both on the base contract work and any temporary or extra work assigned: Increases to cover field overtime authorized by Koppers' authorized representative shall be limited to actual premium time paid to hourly or building trade union type of employees plus associated taxes; insurance and welfare benefits which the seller is legally required to pay, but excluding overhead and profit. Seller's invoices for overtime costs shall be rendered separately each month and shall indicate the straight time wage rate and the premium hours paid by crafts for

each payroll period. Seller shall furnish Koppers' field offices daily with force reports for the period for which premium time has been authorized. The daily force reports must indicate the employees' names and badge numbers, crafts and hours worked."

Here again, inefficiencies caused with the scope of the contracted work would be limited to premium time less overhead and profit, and would prevent further claims for inefficiencies. Ernst's claim, however, is for inefficiencies beyond the scope of the contract and is not barred by this clause.

6. *The Firm Price to July 31, 1975*

Ernst claims delay damages and Koppers says only field costs may be in order. The P.O. provided (Sheet 1–W):

"PRICE—BASED ON QUOTATIONS DATED FEBRUARY 11, 1974, APRIL 10, 25 & 26, 1974 $3,356,800.00 LOT

Price is Firm through July 31, 1975. If job duration exceeds July 31, 1975 through no fault of seller, negotiations for additional field costs may be in order. Price does not include check-out or standby time.

In the event of authorized additional and/or extra work, the following composite rate will apply per journeyman hour. This rate includes all supervision, fringes, insurance, overhead, profit, etc., and is Firm until December 31, 1974 19.30/HR"

There is no direct statement, nor do we believe any implication can be drawn from this language, that no damages will be paid for extra costs for extension of the contract time. In fact, prior to the P.O., and omitted therefrom as an agreed item, was Ernst's estimate that the field costs alone would be in the amount of $80,000 per month (as shown by an invoice prepared by Ernst of $400,000, but which was never sent to Koppers). Ernst's work was not completed by July 31, 1975 and no successful negotiations were completed.

Furthermore, the instructions to bidders provided (¶ 1.6):

"For any extra electrical work that Koppers Company may propose, the successful bidder shall furnish to Koppers Company an estimate of the cost (material, labor, insurance cost, plus percent for overhead and profit) of such work. The electrical contractor shall proceed only after receiving a written order from Koppers Company establishing the agreed price and describing the work to be done."

Under these circumstances, we find that delay damages may be claimed on those items in excess of the scope of the work contemplated, where Koppers ordered work done without estimate or written order but which was necessary to complete added work.

B. KOPPERS' DEFENSES

1. *Ernst's Delays Caused Its Own Inefficiencies*

Koppers contends that Ernst did not start its work promptly as it became available and that this delay was the cause of the flurry of work in the last six months of the Project.

Koppers has reviewed at some length the Sovjak analysis letters of the PERT/CPM updates. The letter of the May 30, 1974 update indicated the Project was already late prior to the Ernst P.O. The letter for the October 17, 1974 update set forth in part, "Electrical activities are showing up prominently on the top negative paths, viz. –13.9, –12.5, –11.1, etc. The subcontractor should review his activity duration times, as well as the logic, to see that these are correct, to the best of his knowledge". Similar letters for the updates of November 14, 1974, December 12, 1974, January 9, 1975, and March 6, 1975 were issued. The letter for the update of April 3, 1975 indicated, "The Electrical Work along with several 'key' material deliveries, is now the critical area."

In the letter on the May 29, 1975 update, under the heading "General Comments", for the first time there is the statement:

"It appears, if the networks were and are correct and we must assume they are since we have received no changes from the sub, that the job has been undermanned from as early as Nov. 74."

While this matter of manning had been taken up preliminarily at a job conference on August 22, 1974 to coordinate the activities, it was at the job conference of January 16, 1975 that Ernst was requested to procure additional journeymen, and did so. Except for the testimony of A. E. Jones, retired Koppers' Vice President, that Ernst had been told of Koppers' dissatisfaction with their performance, no substantial undermanning has been proven. While Benjamin Wilkinson, Koppers' Assistant Resident Superintendent, testified that he believed, "Ernst created the problem themselves by not doing them months ahead of time when the areas were open to them", he did not testify that Ernst did not perform the work as scheduled in the CPM, and this is important. We have thus found that the weight of the evidence on the issue of Ernst's fault must rest with the finding that Ernst was not at fault.

The testimony offered by Koppers' expert, David Lee, compared the CPM update of May 30, 1974 with the update of September 18, 1975, the last CPM run. According to Lee, Ernst delayed Koppers activity through Ernst's failure to commence activities when they were available. The Court asked how the witness could say what constituted the period of delay without knowing the duration requirements from each CPM update, and without knowing the history of the constraints on that particular activity throughout the updates. The witness gave no real explanation, except to say that in his opinion it was not necessary.

On the contrary, Ernst's expert, William C. Wagner, reviewed the Lee analysis of Ernst's electrical work and of the various restraints involved, noting that the original restraints and durations as assigned by Koppers were, in many cases, changed by Koppers at Ernst's suggestion. Thus, any comparison of the May 30, 1974 CPM run and the update of September 18, 1975 was not valid for this purpose. In 95% of the cases examined by Wagner, the updates had been changed (Tr. p. 3670). For example, where Mr. Lee had indicated that a certain activity was available on December 30, 1974, in fact, it was not released until February 5, 1975 (Tr. p. 3672A). Even so, Ernst began work on that activity on January 29, 1975, a week ahead of what could have been expected, even though Koppers' expert tried to make it appear as if Ernst was responsible for delay. The same can be said about the duration of that activity, originally listed as one week; Koppers had agreed to extend it to nine weeks, and it was carried out within the scheduled time (Tr. p. 3675). From Wagner's analysis, Ernst had done all that could have been expected under the situation as shown by the CPM schedules. We find the Wagner testimony to carry more weight than the testimony of Koppers' expert, who had not reviewed the CPM updates.

Mr. Wagner went further to say that review of the CPM updates was required to determine whether or not Ernst was responsible for any delay in Koppers' work, and he found after such review that Ernst was not responsible. In his overall analysis, the original CPM showed 50% of all electrical work should have been able to start by the middle of December 1974, when, in fact, 50% of the activities were not available to start until after the original Project completion date of June 17, 1975 (Tr. p. 3585). Thus, there was almost a five month slippage period from the diagrams that Ernst first bid on versus what was available to start under the Lee analysis. Lee's opinion, given credence by the Court, was that Koppers' Engineering, Design, and Procurement Departments were responsible for the delay. Thus, the credible evidence convinces us that Ernst was not responsible for the delays but, rather, that the late engineering, the extended durations and additions in design, and then the slippage in Koppers' procurement of materials, were the significant causes of the late completion in the Project (Tr. 3701).

2. *The Thirty Day Clause*

Koppers also defends on the basis of a provision in the P.O. which states (Seller Agrees to Comply With, ¶ 6):

"It is the responsibility of the seller to register a claim for additional monies within thirty (30) days of receipt of revised drawing. Any request received at a later date will not be honored. Seller cannot proceed with any work for which he will claim an extra without the written authorization of Koppers Company, Inc.

Not included in this category are those changes which are created by deviation to Contract between Jones & Laughlin Steel Corporation and Koppers Co., Inc. In those instances, seller will be requested to furnish a quotation."

Koppers undoubtedly can conceptualize, engineer, and construct a complex industrial component for a giant steel mill, such as the preheat unit for the coke oven battery A–5 at J&L's Aliquippa Works. They met artificial charge dates set by their customer and worked in areas constrained by ongoing production all around them. They accomplished this while they were coordinating design engineering with field construction, increasing the difficulty of the task. In addition, Koppers incorporated, almost as they occurred, changes in the J&L Project dictated by the failures of their earlier duplicate "unique" plant at Inland, and accomplished it all within six months of the target date. One must have an immense admiration for such construction genius. Furthermore, this construction occurred during a period when Federal price controls were lifted, with the inevitable problems of procurement thereby engendered, and during a period of labor cost escalation, when stable prices on anything were hard to come by and were guaranteed for very short periods of time. It is no wonder that the $46,000,000 project cost J&L, in the end, over $61,000,000.

We are here, however, considering the claim of the subcontractor that Koppers caused it extra work and, thus, expense. Koppers replies, "You didn't present your claim within 30 days as required by your contract", and therefore alleges it is free of any and all liability to Ernst for work performed by Ernst beyond its contract. To this Ernst replies that this provision of the contract, in light of the actions of the parties, was waived and thus cannot shield Koppers from liability.

We first note that Ernst, although not strongly stressing the point, argued that inasmuch as the Court had denied a Motion for Summary Judgment on this very issue, the doctrine of the law of the case should apply. We, however, agree with Koppers in this regard that when the Motion for Summary Judgment was denied, as the record will show, it was denied because a genuine issue of material fact was found to exist, which necessitated resolution by the trier of fact. *Switzerland Cheese Association, Inc. v. E. Horne's Market, Inc.*, 385 U.S. 23, 87 S.Ct. 193, 17 L.Ed.2d 23 (1966); *Benson Hotel Corp. v. Woods*, 168 F.2d 694, 697 (8th Cir. 1948).

Further, Ernst contended that Koppers should have affirmatively pleaded the "delay clause", citing Rule 8(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

"In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense."

It is true that if an affirmative defense is not pleaded, it is waived at the expense of the party who should have pleaded the affirmative defense. That party may not introduce evidence in support thereof unless the adverse party makes no objection, in which case the issues are enlarged, or unless an amendment to set forth the affirmative defense is properly made. 2A *Moore's Federal Practice* ¶ 8.27[3]. But as succinctly stated by the court in *United States v. F. D. Rich Co.*, 525 F.2d 760, 767 (7th Cir. 1975):

"Appellants argue that Rich [the contractor] is foreclosed from relying on Ar-

ticle XXVII [of the contract] because it was not pleaded by Rich as an affirmative defense under Fed.R.Civ.P. 8(c). This argument is without merit. The issue is a matter of interpreting the contract between [the contractor and the subcontractor]. The contract must be read as a whole. Article XXVII is not a separate agreement reached by the parties after breach."

It was not surprise in this situation, and we do not rule out the defense on that basis.

The evidence strongly indicated, and we have so found, that in the first part of 1975 and throughout the summer, there was a rash of drawing revisions issued without written authorizations or requests to furnish quotations, but, rather, on plans marked "approved for construction".

On May 30, 1975, James Shannon of Ernst wrote to Koppers stating:

"We have decided to stay with the project and to make every effort to meet the end date of August 30, 1975. However, we must request that the 30-day clause be waived, and an opportunity be given us to recover the monies for any additional construction work at a later date.

We have proceeded with all good intentions and trust we will receive your consideration of this matter. A prompt reply would be appreciated."

Koppers' Robert Beale received this letter, as well as a letter written by Shannon under date of July 2, 1975, in which Shannon stated:

"Having not received an answer in the last 30 days, we feel you are in agreement to waive the 30 day clause for submitting extras. These items will be resolved at a later date, in order that the engineering personnel on the project can proceed and perform the necessary functions to see its completion."

Robert Beale testified that he did not consider these letters worthy of response since his immediate superior, Robert Moran, had told Shannon that no waiver would be given. Beale later contradicted himself by saying he had told Shannon later on that he had no authority to grant such a waiver, even though on cross-examination he had said he had made no reply of any kind, in any form, at any time, to this correspondence. He claimed, in a most unbelievable fashion, that they were working on the Ernst claim on a purely "commercial" basis, which did not involve in any way a consideration of the legal position of Koppers on the non-waiver of the 30 day provision. Instead, Beale said, Koppers commenced an item-by-item analysis and embarked upon a series of negotiations which would have been a massive effort in frivolity, and a waste of time, unless Koppers either never intended to enforce the 30 day clause or knew they had waived its provisions.

We must then determine whether the conduct of the parties affects Koppers' right to insist upon the 30 day clause. *Burger King Corp. v. Family Dining, Inc.*, 426 F.Supp. 485, 493 (E.D.Pa.1977), *aff'd without opinion* 566 F.2d 1168 (3rd Cir. 1977); *Shapiro v. Royal Indemnity Co.*, 129 F.Supp. 54, 62 (W.D.Pa.1954), *aff'd* 224 F.2d 89 (3rd Cir. 1955); *United States v. Klefstad Engineering Co.*, 324 F.Supp. 972, 975 (W.D.Pa.1971).

In the instant case, whether we link the testimony here with the doctrine of waiver, not requiring consideration or a new contract, *see* 3A *Corbin on Contracts* § 756, or with estoppel, where additional consideration or reliance is necessary to support a contractual modification, *Barnhart v. Dollar Rent A Car Systems, Inc.*, 595 F.2d 914 (3rd Cir. 1979), justice requires a finding here that the 30 day provision cannot be enforced.

As to waiver, after receiving Shannon's letters (and we place no credence in the testimony that Moran had been in touch with Shannon), Koppers should have spoken out and made its position clear. Ernst, by its continued performance under the contract (by relying on Koppers' silence and proceeding with its work), gave up its ability to comply with the 30 day clause on a major portion of the work.

The elements of estoppel are defined in *GAF Corp. v. Amchem Products, Inc.,* 399 F.Supp. 647, 657 (E.D.Pa.1975), *rev'd on other grounds* 570 F.2d 457 (3rd Cir. 1978), as follows:

> "(1) that the one party by 'acts, representations, or admissions, or by his silence when he ought to speak out,' induces another to believe certain facts exist;
>
> (2) that the party making the representations expects them to be acted upon by the other party; and
>
> (3) that the party making the representation possessed actual or constructive knowledge, or was culpably negligent in failing to discover the true facts." (Citations omitted)

*See also Goodwin v. Hartford Life Insurance Co.,* 491 F.2d 332 (3rd Cir. 1974). All are present here.

We thus hold that the 30 day limitation period of the contract had been waived and it is necessary that we discuss the substance of the claims made by the Plaintiff.

3. *Commercial Impracticability and Forseeability*

We have not overlooked Defendant's contention that the doctrine of "commercial impracticability" would, in any event, have barred Plaintiff's Count I claim. The doctrine does not apply in this case.

It is true that the essential element of Ernst's claim is based on delays and inefficiencies resulting, it says, from J&L's insistence on changes and on failures to enable the work to proceed in a certain fashion, and also on Koppers' inability to have certain materials delivered on schedule. It is apparent from the evidence that Koppers' material problem arose from the lifting of price controls in April 1974. However, this is not the type of impracticability embraced within the doctrine.

We are aware that absolute liability existed initially but was modified within the *Restatement of Contracts* in 1932, as follows (§ 454):

> "In the Restatement on this Subject impossibility means not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved."

As Williston emphasized in his 1938 Treatise on Contracts, it is a question of what the parties reasonably contemplated that performance would entail. 18 *Williston on Contracts* §§ 1931–79 (Jaeger rev. ed.). *See also West v. Peoples First National Bank & Trust Co.,* 378 Pa. 275, 106 A.2d 427 (1954); *Transatlantic Financing Corp. v. United States,* 124 U.S.App.D.C. 183, 363 F.2d 312 (D.C.Cir. 1966).

In the *Restatement of Contracts,* Second, it was stated (Introductory Notes to § 281, at p. 42):

> "The rationale behind the doctrines of impracticability and frustration is sometimes said to be that there is an 'implied term' of the contract that such extraordinary circumstances will not occur."

Suffice it to say at this point that the lifting of price controls was certainly not such an event to be so extraordinary as to relieve Koppers of its duty to make payment for delays caused by its failure in procurement. We do not in this sense see that justice requires that Koppers' performance should be excused at a cost to Ernst.

In an ordinary construction contract some delays are foreseeable, though not within the control of the parties, and do not provide a basis for recovery. *Union Paving Co. v. City of Philadelphia,* 95 Pa. Super. 342 (1929) (third party's performance was a necessary predicate for a construction project, but third party's failure to perform, thus preventing plaintiff from performing, was not a basis for recovery). Here, where the delays were tight against a completion date being insisted upon by Koppers, the subcontractor, in justice, cannot be held to foresee such delays and prevented from recovering additional expense incurred by reason thereof.

C. DAMAGES

Under the foregoing discussion, we have concluded that there is liability by Koppers to Ernst on Ernst's Count I claim. Ernst presented this claim for the first time

on May 31, 1977, even though Ernst had been presenting claims to Koppers for drawing revisions during discussions as early as 1975 and throughout 1976, and even though Ernst had previously indicated, at Koppers' request, that it had no claim beyond the drawing revision claim. We find that Koppers was aware of these additional claims, thus was not surprised. Furthermore, Ernst is not estopped from asserting these claims now because there is no evidence that Koppers detrimentally relied on Ernst's failure to bring these claims forward during the negotiations for the drawing revision claims.

We find that Ernst was on the job four extra months through no fault of its own. The question is whether Ernst has proven damages to which it may have been entitled for the impact of work beyond the scope of the original contract.

We previously noted that the P.O. set forth:

> "Price is firm through July 31, 1975. If job duration exceeds July 31, 1975 through no fault of seller, negotiations for additional field costs may be in order."

The P.O. also provided: "This order constitutes the entire agreement," and as such of course is controlling. *See Lichter v. Mellon-Stuart Co., supra.* See also, Annot., *Validity, Construction and Application of "No Damage" Clause with Respect to Delay in Construction Contract,* 10 A.L.R.2d 801 (1950).

We thus find that the P.O. is an integrated writing and includes the agreement of the parties on delay damages, so that Ernst's sole and exclusive remedy for delay within the scope of the P.O. is as set forth therein, both as to entitlement and damages. Accordingly, Ernst may seek damages for delay only if such delay is attributable to Koppers and may recover only "additional field costs". The burden of proof is on Ernst to establish the duration of delay, the fact that such delay was through no fault of Ernst (and we have so found), and the causal relationship between such delay and the necessary and reasonable additional field costs. *Joseph Pickard's Sons Co. v. United States,* 532 F.2d 739 (Cust. & Pat. App.1976); *Boyajian v. United States,* 423 F.2d 1231, 141 Ct.Cl. 233 (1970); *J. D. Hedin Construction Co. v. United States,* 347 F.2d 235, 171 Ct.Cl. 70 (1965).

In its Count I damage calculations, Ernst employed a variation of the "total cost" method. Normally, under this method, a contractor or subcontractor uses the difference between the total actual cost of performance and the amount of the contract price, as increased by change orders. Here, Ernst began with the number of productive electrical journeyman hours (82,980 hours), an average of three different manpower estimates prepared by Ernst. It claims that because of extensive changes in the scope of the work and because of the delays and interferences with Ernst's work for which Koppers was responsible, Ernst was compelled to spend a total of 289,426 productive journeyman hours for the completion of its work. Some of the time is attributable to agreed upon change orders and some to the work Ernst performed with respect to drawing revisions, which is not applicable here. By subtracting the number of hours required by the P.O. and other hours not applicable to drawing revisions, Ernst calculates that 114,500 of the 289,426 productive journeyman hours were incurred as a direct, sole, and natural consequence of Koppers' acts and failures to act which delayed or interfered with Ernst's performance of its work. These hours, Ernst says, are the "impact" of the changes, delays, and interferences incurred by Ernst. Using the arrival dates of drawing revisions as a guide, Ernst allocated them to the various years, that is, 44,540 hours allocated to 1974, 65,494 hours allocated to 1975, and 4,465 hours to 1976. The hourly "straight time" labor rates properly chargeable to Koppers during these years, Ernst claims, were $19.30, $20.77, and $22.98 respectively. Ernst claims that the method used by it to estimate its escalation damages, if anything, favors Koppers by allocating the 44,540 hours to 1974, when, in reality, the consequences of the Koppers-imposed crash pro-

gram happened in 1975, when labor rates were higher.

Koppers replies that the figure of 82,980 hours, which Ernst now uses as its original estimate of hours required to complete the work, has no basis in fact since it is only an average of manpower estimates prepared by Ernst on or about August 1974.

Assuming for a moment the validity of the "total cost" approach, the manpower charts showed 96,000 journeyman hours, and Ernst's letter of April 10, 1974 to Koppers stated that Ernst's estimate of journeyman hours for the job was 100,470; this is the figure we believe should be used if there is any validity to the "total cost" approach. In addition, Ernst's calculation of its Count I damages fails to exclude approximately 10,000 hours expended by Ernst on the temporary light and power contract for which it has already been paid in full. It is obvious to the Court that Ernst's hypothetical allocation of unpaid journeyman hours on the basis of the number of drawing revisions received per year is invalid. Not all drawing revisions required work by Ernst, and all revisions requiring work would not cause an equal amount of work. Thus, a calculation based on an artificial method of allocation is not a proper substitute for a calculation based on historical expenditure of labor.

There is, however, a more fundamental defect in Ernst's approach to its damage under Count I. Ernst has applied the total cost concept not to its cost in dollars to perform the work, but to the alleged number of man hours expended on the job. There was no showing that the man hours of the Count I calculation related to Ernst's actual cost of performance. The Court thus rejects the Plaintiff's calculation as given. For comparable rejections, *see Seger v. United States,* 469 F.2d 292, 199 Ct.Cl. 766 (1972); *F. H. McGraw & Co. v. United States,* 130 F.Supp. 394, 400, 131 Ct.Cl. 501 (1955) (portion of plaintiff's claim disallowed because damages were based upon plaintiff's assumption that plaintiff's costs were reasonable and that plaintiff's bid was accurately computed, "which is not always the case by any means").

The plaintiff in *G.C.S., Inc. v. Foster Wheeler Corp.,* 437 F.Supp. 757 (W.D.Pa. 1975) and 437 F.Supp. 764 (W.D.Pa.1977), *aff'd* 578 F.2d 1374 (3rd Cir. 1978), admitted, as Ernst does here, that it could not offer evidence of the precise number of days of delay or dollars of harm caused with respect to the numerous change orders, drawing revisions, and so forth. There, the court stated:

> "GCS admits that it cannot support its claim for damages for delay on any particular item, or on any total of particular items, but rather relies upon the cumulative effect of the various late drawings which 'caused a loss of momentum and interference with its work plan or sequence which substantially expanded the time within which GCS could be reasonably expect to complete its work.'
>
> Nowhere in the supplemental answers to the interrogatories does GCS set forth the causal relation between the delayed receipt of drawings and the fact of damages; it is not shown in any specific instance that men, machinery, or equipment were made idle, at GCS's cost, pending the receipt of any delayed drawings."

437 F.Supp. at 760.

On GCS's motion for new trial, the court denied the motion and reaffirmed its prior judgment ruling, saying:

> "G.C.S. admitted that it could not offer evidence of the specific time or money loss caused by any particular act of Foster Wheeler, but attempted to rely on a cumulative effect theory. G.C.S. was unable to segregate delays attributable to Foster Wheeler, from those delays of its own causing, or delays to which it was subject by the provisions of the contract."

437 F.Supp. 770.

We do not doubt that Ernst encountered delays and difficulties, as we so found, but Ernst has attempted to prove only the total amount of costs and the total delay experienced on the Project. As in *Wunderlich Contracting Co. v. United States,* 351 F.2d 956 (Ct.Cl.1965), unsatisfac-

tory evidence has been presented to differentiate between reasonable and unreasonable delays, or between delays unavoidably caused by extraneous circumstances. It is incumbent on the Plaintiff to show the nature and extent of the various delays for which damages are claimed and to connect them to some act of commission or omission on the defendant's part. Some basis for allocation must be present in the evidence of the case, *see Lichter v. Mellon-Stuart Co., supra,* and where a plaintiff is unable to segregate delays and damages caused by the defendant from delays and damages attributable to other factors, no damages may be awarded. *S. J. Groves & Sons Co. v. Warner Co.,* 576 F.2d 524 (3rd Cir. 1978); *Fruin-Colnon International S.A. v. Concreto S.A.,* 231 F.Supp. 14 (D.Canal Zone 1964). Finding no basis for segregation in this case, we are unable to award damages to Ernst on the Count I claim.

## D. COUNT II

### 1. *The Burden of Proof on Extras*

It is an elementary principle of contract law that in order to recover for "extras", Ernst must show that they are in fact extras. As stated in *Beaty v. Brock & Blevins Co.,* 319 F.2d 43, 44 (6th Cir. 1963), "'Extra work' or 'additional work' in this sense means work other than that contemplated in the original specifications and addenda." All of the initial related documents must be read to determine what work is contemplated. *Dunlap v. Warmack-Fitts Steel Co.,* 370 F.2d 876 (8th Cir. 1967). As stated in *Leo A. Daly Co. v. Ray Smith Industries, Inc.,* 387 F.2d 899, 900 (5th Cir. 1968), where extras claimed for were not included in the final plans and specifications, but had been included in tentative bidding drawings and bidder's instructions:

> "It is self-evident from the nature of the final plans and specifications that they are but an architectural skeleton, though naturally a complex one, whose flesh is to be supplied by other sources, especially P.O.D. 39 ['Construction Requirements for Leased Postal Facilities—Bidders Instructions'], to which a multitude of reference directives are given in the final plans and specifications themselves."

Thus, the court in the *Leo Daly Co.* case examined each claimed extra on an item-by-item basis to determine whether the same was barred by the bidder's instructions, tentative drawings, or final plans. *See E. C. Ernst, Inc. v. Manhattan Construction Co.,* 387 F.Supp. 1001 (S.D.Ala. 1974), *aff'd in part and vacated in part* 551 F.2d 1026 (5th Cir. 1977), *cert. denied* 434 U.S. 1067, 98 S.Ct. 1246, 55 L.Ed.2d 769 (1978).

We have examined, on a claim-by-claim basis, the items which make up Count II of the Complaint. We note that by the summer of 1975, more than 1,000 drawing revisions had been delivered to Ernst. Some were revisions of revisions, and many arrived on or after the original charge date. All revisions called upon Ernst to provide extra work, work in addition to the work defined by the original contract, or to revise the work defined in the original contract. Ernst performed the work called for by the drawing revisions, and, while some revisions were incorporated into Koppers' extra work orders, most revisions were not. The extra work performed has not been paid for as yet.

### 2. *The Drawing Revision Claim*

It is apparent that for tax reasons, J&L demanded the coke oven battery be operative by January 1, 1976. To achieve this goal, Koppers and its subcontractors were required to complete tasks which had not only been delayed but had also been expanded by 70% in scope in a time framework that had been expanded by only 27%. There was a crash program to complete the Project; Ernst, as well as other subcontractors, was required to perform more work than had been originally contemplated in a shorter time frame.

When Koppers sold the Project to J&L in June 1973, it anticipated 928,000 hours of direct labor, including 110,000 man hours for electrical work. As a result of the crash program, the total commitment added 654,-

000 hours of direct labor. Of all labor committed to the Project, more than two-thirds was committed in the last six months of what became a 30 month job, and 50% of Ernst's work was done in the final six months.

Obviously to accomplish this job, many drawing revisions were required. Because of the number and frequency of drawing revisions, the time involved in comparing bid drawings to revisions and pricing the extra work such revisions might require, and the necessity of proceeding promptly on plans "approved for construction", Koppers did not require price proposals.

Koppers defends against this drawing revision claim on the basis that Ernst did not submit its claim within 30 days, as required by the P.O. We have already determined that the 30 day provision did not operate as a bar to the Count I claim, and likewise hold that it does not bar Ernst's Count II claim.

By early October 1975, Robert Beale warned Koppers' various managers as follows:

> "Subject subcontractor [Ernst] has expended through the latest billing date of September 30, 1975 a total of 159,170 productive man hours. This compared to a 100,000 man hours in Ernst's original bid represents an over-run of 59,170 man hours to date. . . . [S]trict attention should be directed to the overall estimated total man hours of 264,556 [which would be required to finally finish the project] which includes productive, non-productive, and supervisory labor.
>
> * * * * * *
>
> Drawing revisions—to date, this department has transmitted drawings covered by Engineering work letters on 172 [transmittal letters]. While most of these drawings do not cover revisions or additional work, many do represent changes. This will represent additional costs which will have to be negotiated on the basis of dollar value for a particular change."

By the time of the Beale memorandum, Ernst had received sufficient drawings to allow it to attempt an accurate analysis of the changes in the contract, and their estimators began comparing the latest drawing revisions with the original bid drawings. These pricing lists were then turned over to a single estimator, Shadler, who reviewed the estimates in order to eliminate duplications, adding and subtracting costs as indicated by the revisions. Shadler not only used the price of materials, but also computed the hours of journeyman-level electrical labor necessary to install the materials. These hours of labor units reflected Ernst's experience and the estimator's judgment of the Project's conditions and difficulties. The hours of additional labor were priced at $20.77 per hour, using the journeyman electrician rate then charged by Ernst; a $5.60 factor was added thereto, representing the "hidden [engineering] costs" to Ernst, not otherwise reflected in the journeyman labor rate. The hours of labor associated with deleted work were credited to Koppers at $15.80 per hour, the journeyman rate less Ernst's overhead and profit.

Shadler determined the aggregate pricing for performing the work required by the revised drawings to be $1,544,307, and on December 9, 1975, sent a letter to Koppers, in effect a bill, requesting payment of this amount. Shadler's bill was revised on December 12, 1975 to give effect to a certain field authorization and to addition and deletion corrections; the second bill (again in the form of a letter) requested payment in the amount of $1,494,853. The amount was further reduced to $1,484,000. After detailed examination of the testimony presented here, we find that all of these items are properly chargeable as "extras" which were not part of the scope of the original contract, and that Ernst's method of calculation was reasonable.

Many of the parts of the claim for the drawing revisions were accepted entirely by several Koppers' analysts. For example: the claim for drawing 6A24 of $26,585 was accepted in full by Koppers' Purchasing and Engineering reviewers. Similarly, claims were accepted in full for drawings 6A74

($25,092); 6A122 ($10,810); 6A144 ($34,-710); 6A208 ($19,729); 6A388–89 ($23,000); 6A410–14 ($20,369); 6A549 ($64,993); and 6A552–53 ($27,754). Koppers therefore embraced Ernst's method of pricing labor at $26.30 per hour for additions and materials added, and a lesser price for deletions. In other instances, one analyst would accept the entire claim for a particular revision, while other analysts would accept only part (6A120, $55,000).

We note that the consensus among Koppers' personnel, after reviewing Ernst's claim for "extras", was that the claim was worth no more than $500,000, and this is the amount at which Koppers valued the Ernst claim internally. Numerous negotiations were carried out throughout 1976, and Koppers requested that the claim be presented in the format desired by them. Ernst resubmitted a portion of its claim under the Koppers' format, but another portion of the claim was never resubmitted when Ernst became convinced that Koppers did not intend to honor a substantial portion of its claim.

It is interesting to note at this point that when Koppers advanced its own claim against J&L, included in the amounts being sought was $500,000, representing Koppers' appraisal of what Ernst might accept with respect to its drawing revision claim. No part of the $4,000,000 settlement between J&L and Koppers was ever forwarded to Ernst, not even for those extra work claims considered by Ernst as "accepted" by Koppers, field work performed by Ernst pursuant to written Koppers' "authorization" forms, or any part of the admittedly due contract retention of $60,430.

Koppers argues that it has shown that the number of revisions on this job was not greater than on other jobs of comparable complexity on which Koppers had worked. We see this as no answer to the claim for extras when work was required to be done beyond the scope of the Project as originally planned, particularly in light of Koppers' undertaking to conceptualize and construct the Project. Whether or not on-the-spot pricing of the revisions was "impossible", as Ernst asserts and Koppers denies, is not relevant to the question of whether or not they were "extras" which Koppers knew very well were not being priced or given authorization, even though this was required by the P.O.

There was no showing whatsoever here that Koppers admitted liability to Ernst when it negotiated a settlement with J&L. Furthermore, it may be true that changes in sequence of work frequently occur in major construction contracts, and that this Project was no different. But these are not bases for a denial of claims for extras.

While we grant Plaintiff damages on Count II, the contract contemplated that a claim for revised drawings would be "reviewed on the basis that $500 be to the account of the Seller [Ernst]." Johns of Ernst did not apply this provision when he prepared that portion of the drawing revision claim. We believe that $500 must be deducted from each claim over $500 and all claims under $500 must be dropped, for a total of $62,080, leaving a balance of $1,421,920 owing to Ernst on Count II.

## E. COUNT III

The six Ernst work orders that comprise Count III are for work performed pursuant to field authorizations and directives issued by Koppers. These directives were issued, either orally or in writing, in order to expedite a solution to problems in the field without recourse to the drawing board. These were, in effect, an order from Koppers to proceed with such work. Ernst performed the work and calculated the hours and materials required to perform the work; then labor was priced at the journeyman rate then in effect.

The six work orders amount to a claim of $9,581.64. Since we have determined the Ernst computation to be reasonable, Plaintiff is entitled to recover the full amount.

## F. THE COUNTERCLAIM

Koppers customarily provided field engineers to assist subcontractors and the J&L Project was no exception. In fact, Koppers

had made a commitment to J&L to provide such engineers. The services of these engineers were in the first instance considered part of the bill to J&L under the 1973 contract, but were later billed again to J&L under deviations which followed J&L authorizations or extra work orders. In some instances, their services were further billed to and paid for by Ernst. There was no proof offered with respect to the other aspects of the counterclaim.

We are fully aware that Koppers would not supply "supporting personnel" under the P.O. But the supplying of personnel to explain its incomplete drawings is not with "supporting personnel", and gives no right to Koppers to recover as a counterclaim the sum of $105,875.

Further, the Koppers' claim of $274,000 in premium time payments cannot be justified on the basis that the delay in performance was the fault of Ernst. We do not so find and there is no basis for this claim.

Koppers claims $869,871 as a result of overtime payments necessary to speed up final check-out required, it says, when Ernst delayed energizing the 460 volt preheat substation. We have found that delay was not the fault of Ernst and there is no proof of this or $481,140 in inefficiency claims on overtime paid by Koppers. It does, of course, indicate the validity of overtime inefficiency claims, but we have found insufficient evidence to allow Ernst or Koppers to recover for this.

## III. CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and subject matter of this litigation under the statutes of the United States by reason of diversity of citizenship among the parties and the amount in controversy exceeding $10,000.

2. This action arises out of an integrated flat sum contract between the parties evidenced by Koppers' Purchase Order 2463–2–002, dated June 4, 1974, and documents incorporated therein.

3. The law to be applied is the law of Pennsylvania by reason of the fact that the contract between the parties was executed and performed in Pennsylvania.

4. In the Purchase Order, the parties provided: "Price is firm through July 31, 1975. If job duration exceeds July 31, 1975 through no fault of seller, negotiations for additional field costs may be in order." It was also provided therein that: "This order constitutes the entire agreement". This provision limited damages for delay only within the scope of the work contemplated by the contract. Such a paragraph does not constitute a "no damage" provision and is not controlling in this action where the scope of the work was vastly increased by Koppers.

5. While the provision above limits damages for delay when such delay is "through no fault of seller [Ernst]", the delays in this case, having not been found to be the fault of Ernst, are the proper basis for the recovery of additional costs by Ernst.

6. The method used by Ernst to establish and calculate its damages for delays is a variation of what is called the "total cost" method. There has been no showing in the case that the number of man hours under the delay calculations was related to Ernst's cost of performance of the work beyond the scope contemplated by the Purchase Order, and cannot form the basis of a damage award.

7. Ernst is entitled to recover from Koppers the sum of $1,484,000, the reasonable value of the additional labor and materials expended pursuant to drawing revisions or additions, less $62,080, as provided for under the $500 deductible provision, or the sum of $1,421,920, with interest thereon from December 12, 1975.

8. Ernst is entitled to the retainage of $60,430, with interest thereon from December 12, 1975.

9. Ernst is entitled to $9,581.64, the reasonable value of work performed pursuant to Koppers' field authorization, with interest thereon from October 15, 1975.

10. Although Ernst did not make its full claim on Koppers prior to Koppers' negotia-

tions with J&L, Ernst's conduct did not amount to a modification or waiver of any provision of the Purchase Order.

11. Ernst therefore is not estopped from recovery from Koppers on the basis that it either acquiesced in or participated in the delays.

12. Koppers, by its conduct, is not entitled in defense to enforce the provision of the Purchase Order which provides that Ernst's claims for additional work should be submitted to Koppers within 30 days of the receipt of the revised drawings as Koppers willingly accepted Ernst's performance without requiring prior authorizations or bids, or prompt settlement therefor.

13. Koppers' counterclaim for additional costs for delay is dismissed for failure of proof that any act or failure to act attributable to Ernst delayed completion of the Project.

14. Ernst is entitled to recover costs. Judgment shall issue accordingly.